JASON M. FRANK (190957)
ANDREW D. STOLPER (205462)
SCOTT H. SIMS (234148)
FRANK SIMS & STOLPER LLP
19800 MacArthur Blvd., Suite 855
Irvine, CA 92612
Telephone:   (949) 201-2400
Facsimile:    (949) 201-2405

FRANKLIN D. AZAR (pro hac vice )
FRANKLIN D. AZAR &
ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:   (303) 757-3300
Facsimile:    (720) 213-5131

*Attorneys for Plaintiffs, the Proposed Class and Subclasses*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MARTIN and LORI MITCHELL, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TOYOTA MOTOR CREDIT CORPORATION, a California Corporation<br><br>Defendant. | Case No.:  2:20-cv-10518-JVS-MRW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF NATIONWIDE CLASS ACTION SETTLEMENT**<br><br>**[*Declarations of Jason M. Frank, Franklin D. Azar, L. Scott Baggett, Christopher Longley, William Martin and Lori Mitchell and [Proposed] Preliminary Approval Order filed concurrently herewith*]**<br><br>**Date:      July 11, 2022**<br>**Time:      1:30 p.m.**<br>**Courtroom:   10C** |

**TO THE COURT AND ALL PARTIES OF RECORD:**

**PLEASE TAKE NOTICE** that on July 11, 2022 at 1:30 p.m. in Courtroom 10C of the United States District Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, California 92701-4516, or on a different date set by the Court, Plaintiffs will and hereby do move for an order:

1.      Granting preliminary approval of the Stipulation Re: Nationwide Class Action Settlement and Release (the "Settlement" or "Settlement Agreement"), a copy of which is attached as **Exhibit 1**.

2.      Certifying the proposed Class (including the Statutory Class and Non-Statutory Class) for settlement purposes only.

3.      Appointing Plaintiffs William Martin and Lori Mitchell as the Class Representatives.

4.      Appointing Jason M. Frank, Andrew D. Stolper and Scott H. Sims of Frank Sims & Stolper, LLP and Franklin D. Azar of Franklin D. Azar & Associates PC as Class Counsel.

5.      Appointing Atticus Administration LLC as the Settlement Administrator.

6.      Approving the proposed Notice Plan, including the form and manner of providing Notice of Settlement to the Class.

7.      Setting the relevant deadlines for a Final Approval Hearing.

This Motion is based on the grounds that (a) the Settlement is a fair, adequate and reasonable compromise of the claims at issue in this lawsuit, (b) the proposed Settlement Class satisfies the requirements of Federal Rule of Civil Procedure 23 and (c) the Notice Plan provides for the best notice practicable under the circumstances and satisfies due process and the requirements of Federal Rule of Civil Procedure 23.

1
2
3
4
5
6
7

        This Motion is based on this Notice of Motion and <u>Unopposed</u> Motion; the attached Memorandum of Points and Authorities; the Declarations of Jason M. Frank, Franklin D. Azar, L. Scott Baggett, Christopher Longley, William Martin and Lori Mitchell filed concurrently herewith; the [Proposed] Preliminary Approval Order filed concurrently herewith; the pleadings on file herein; and such other and further materials to be offered at the hearing.

8
9

Dated:  June 17, 2022                                  FRANK SIMS & STOLPER LLP

10
11

By:___*/s/ Jason Frank*_____
            JASON M. FRANK, ESQ.
            ANDREW STOLPER, ESQ
            SCOTT H. SIMS, ESQ.
            *Attorneys for Plaintiffs*

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>UNOPPOSED</u> MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................9

II.     STATEMENT OF FACTS .................................................................. 11

        A.      Summary of the Allegations and Defenses. ......................... 11

        B.      Procedural History................................................................ 12

        C.      History of the Settlement Negotiations. ............................... 14

        D.      The Settlement...................................................................... 14

                1.      Definition of the Settlement Classes.......................... 14

                2.      Consideration for the Settlement. .............................. 15

                3.      Release. ...................................................................... 18

                4.      Settlement Administrator. .......................................... 19

                5.      Notice Plan. ................................................................ 19

                6.      Claims Period and Process.......................................... 20

                7.      Opt-Out / Objection Process. ..................................... 21

III.    LEGAL STANDARD ......................................................................... 22

IV.     THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS............. 23

        A.      The Proposed Settlement Class Meets the Rule 23(a) Requirements.. 23

                1.      Numerosity.................................................................. 23

                2.      Commonality............................................................... 24

                3.      Typicality.................................................................... 25

                4.      Adequacy..................................................................... 25

        B.      The Proposed Settlement Class Satisfies Rule 23(b)(3). ..................... 26

                1.      Common Factual and Legal Issues Predominate Over Individual Questions.................................................................. 27

                2.      A Class Action is Superior.......................................... 28

V.      The Court Should Grant Preliminary Approval ................................. 29

B.      Negotiated at Arm's Length. ......................................................... 30

C.      Adequacy of the Relief Provided for the Class. ............................. 31

                1.      Costs, Risks and Delay of Trial and Appeal.............. 34

4

2.   Effectiveness of Proposed Method of Relief Distribution......... 35

3.   Terms of the Proposed Award of Attorney's Fees. .................. 36

4.   Agreement Identification Requirement...................................... 39

D.   Equitable Treatment of Class members........................................... 39

E.   The Proposed Notice Plan Satisfies Rule 23. .................................. 39

VII.   CONCLUSION ...................................................................... 41

**UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

Aichele v. City of Los Angeles,
  2015 WL 5286028 (C.D. Cal. Sept. 9, 2015) ........................................ 35, 36, 37

Allapattah Servs., Inc. v. Exxon Corp.,
  333 F.3d 1248 (11th Cir.2003) ...........................................................27

Baker v. SeaWorld Entertainment, Inc.,
  2020 WL 818893 (S.C. Cal. Feb. 19, 2020).........................................39

In re Bluetooth Headset Products Liab. Litig.,
  654 F.3d 935 (9th Cir. 2011) ...............................................................29

Craft v. City of Bernadino,
  624 F.Supp.2d 1113 (C.D.Cal. 2008) ..................................................37

Ellis v. Costco Wholesale Corp.,
  657 F.3d 970 (9th Cir. 2011) ...............................................................24

Ellsworth v. U.S. Bank, N.A.,
  2014 WL 2734953 (N.D. Cal. June 13, 2014).....................................27

Farrell v. Bank of America Corp. N.A.,
  827 Fed. Appx. 628 (9th Cir. 2020).....................................................37

Feller v. Transamerica Life Insurance Co.,
  2017 WL 6496803 (C.D. Cal. Dec. 11, 2017).....................................27

Hanlon v. Chrysler Corp.,
  150 F.3d 1011 (9th Cir. 1998) ..................................................... passim

Herrera v. Wells Fargo Bank N.A.,
  2021 WL 3932257 (C.D. Cal. June 8, 2021)............................... passim

Herrera v. Wells Fargo Bank, N.A.,
  Case No. 8:18-cv-00332-JVS-MRW, Dkt. No. 209 (C.D. Cal. Nov. 16.
  2021) ........................................................................................... passim

In re Hyundai,
  926 F.3d 539 (9th Cir. 2019) .........................................................26, 36

Lerwill v. Inflight Motion Pictures, Inc.,
    582 F.2d 507 (9th Cir. 1978) .............................................................25

In re Medical Capital Securities Litigation,
    2011 WL 5067028 (C.D. Cal. July 26, 2011)....................................26

In re Myford Touch Consumer Litigation,
    2018 WL 10539266 (N.D. Cal. June 14, 2018)..................................32

Nat'l Rural Telecom. Coop. v. DIRECTV, Inc.,
    221 F.R.D. 523 (C.D. Cal. 2004).......................................................33

In re Online DVD-Rental Antitrust Litig.,
    779 F.3d 934 (9th Cir. 2015) .............................................................36

Schmitt v. Younique, LLC,
    2020 WL 1812354 (C.D. Cal. Apr. 9, 2020) (J. Selna)....................26

Staton v. Boeing Co.,
    327 F.3d 938 (9th Cir. 2003) .......................................................28, 36

True v. Am. Honda Motor Co.,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) .............................................22

Valentino v. Carter-Wallace, Inc.,
    97 F.3d 1227 (9th Cir. 1996) .............................................................27

Vedachalam v. Tata Consultancy Serv's, Ltd.,
    2012 WL 1110004 (N.D. Cal. 2012) ..................................................27

Vinh Nguyen v. Radient Pharmaceuticals Corp.,
    287 F.R.D. 563 (C.D. Cal. 2012)........................................................23

Vizcaino v. Microsoft Corp.,
    290 F.3d 1043 (9th Cir. 2002) ...........................................................37

Wal-Mart v. Dukes,
    564 U.S. 338 (2011)...........................................................................24

Wang v. Chinese Daily News,
    709 F.3d 829 (9th Cir. 2013) .............................................................24

Yaron v. Intersect ENT, Inc.,
    2021 WL 5184290 (N.D. Cal. Nov. 5, 2021) .....................................39

7

**Federal Statutes**

Fed. R. Civ. P. 23(a)(2) ........................................................................24

Fed. R. Civ. P. 23(e)(1)(B)(ii) ..............................................................23

Fed. R. Civ. P. 23(e)(2)(B) ...................................................................30

Fed. R. Civ. P. 23(e)(2)(C) ....................................................... 34, 35, 36

Fed. R. Civ. P. 23(e)(2)(D) ...................................................................39

Rule 23 .............................................................................................29, 39

Rule 23(a) .............................................................................................23

Rule 23(a)(1) ..........................................................................................23

Rule 23(a)(2) .....................................................................................24, 25

Rule 23(a)(3) ..........................................................................................25

Rule 23(a)(4) ..........................................................................................26

Rule 23(b) ..............................................................................................23

Rule 23(b)(3) .................................................................................26, 27, 28

Rule 23(c)(2)(B) ................................................................................39, 40

Rule 23(c)(3) ..........................................................................................40

Rule 23(e) .........................................................................................22, 29

Rule 23(e)(2) .................................................................................. *passim*

Rule 23(e)(2)(A) ....................................................................................30

Rule 23(e)(3) .....................................................................................29, 31

**Other Authorities**

California's Consumer Legal Remedies Act ..........................................13

Unfair Competition Law ......................................................................13

**UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT**

## I.   INTRODUCTION

Plaintiffs are pleased to announce the parties have reached a proposed nationwide class action settlement (the "Settlement") with Defendant Toyota Motor Credit Corporation ("TMCC").  A copy of the Settlement is attached as **Exhibit 1**.  Capitalized terms in this Motion shall have the same meaning as those defined in the Settlement.

The Settlement follows a similar structure as the settlement approved by the Court in the related GAP refund class action against Wells Fargo.  See Herrera v. Wells Fargo Bank, N.A., Case No. 8:18-cv-00332-JVS-MRW, Dkt. No. 209 (C.D. Cal. Nov. 16, 2021) ("Wells Fargo").[1]  It also provides substantially more money to Class members on an individual basis.  In consideration for a Release of the Claims in this Lawsuit, TMCC is agreeing to the following:

- **Business Practice Change:** For a minimum of at least four years, TMCC will automatically issue GAP refunds after an Early Payoff in all U.S. States, provided the Early Payoff occurs more than thirty (30) days prior to the Finance Agreement's maturity date. Settlement, ¶ 102.  Plaintiffs' expert conservatively estimates this will result in TMCC paying at least **$275.85 million** in refunds that it was not otherwise paying prior to the filing of this lawsuit.[2]  Declaration of L. Scott Baggett ("Baggett Decl."), ¶¶ 15, 34-36.

- **Statutory Class.**  Statutory Class members whose GAP Agreements were subject to an Automatic Refund Requirement in 12 States[3] will receive full GAP Refunds without any cancellation fees, plus prejudgment interest at the applicable State's statutory

---

[1] A copy of the Final Approval Order in Wells Fargo is attached to the Declaration of Jason M. Frank ("Frank Decl.") as **Exhibit A**.

[2] TMCC implemented this Business Practice Change on October 25, 2021, approximately one year after the filing of this lawsuit on November 17, 2020.

[3] For purposes of the Settlement only, the parties have agreed that the following 12 States had laws, regulations or other guidance that entitled customers to an automatic GAP refund after an Early Payoff: Alabama, Colorado, Indiana, Iowa, Massachusetts, New Jersey, Oklahoma, Oregon, Texas, Vermont, Wisconsin and Wyoming.  Settlement, ¶¶ 5, 61. The applicable statutes and regulations are set forth in Paragraph 59 of the Second Amended Complaint.  Dkt. 58.

interest rate.  Settlement, ¶ 103.  Based on the most recent data provided by TMCC, Plaintiffs estimate there are approximately **43,142 loan files** that fall under the Statutory Class definition, and TMCC will collectively pay over **$19.1 million** to the Statutory Class at an average payment of **$444.21** per loan file.[4]  Baggett Decl., ¶ 28.  These amounts will be directly paid by TMCC, without the need for Statutory Class members to submit a Claim Form, because TMCC can reasonably determine from its own records that such individuals qualify for the refund and interest payments.  Settlement, ¶ 103.

- **Non-Statutory Class.**  TMCC will deposit **$59 million** into a Settlement Fund to pay for GAP refunds to the Non-Statutory Class, plus any Notice and Administration costs, Fee and Expense Awards and Service Awards approved by the Court.  Settlement, ¶¶ 104, 105.  The Settlement Fund is non-reversionary.  Id.  Non-Statutory Class members will be required to submit a Claim Form verifying, *inter alia*, that they did not previously receive a GAP refund from a third-party Dealer or GAP Administrator or suffer a "total loss" of their Vehicle.  Id.  These members will be eligible to receive up to the full amount of their GAP refund without any cancellation fees.  Id.  There are approximately **628,485 loan files** that *potentially* fall under the Non-Statutory Class definition.[5]  Baggett Decl., ¶ 21.

The Settlement provides an outstanding outcome for the Settlement Class and TMCC's customers.  The Settlement is the product of well-informed arm's length negotiations between the parties, who participated in three mediation sessions throughout the litigation, including an initial session before the Honorable Jay C. Gandhi (Ret.) and the two subsequent sessions before the Honorable Andrew J. Guilford (Ret.).  The

---

[4] TMCC is conducting a final account level review and these numbers are subject to change prior to final approval.  In comparison, in Wells Fargo, the average settlement payment to the Statutory Class was **$316.87**.  Herrera v. Wells Fargo Bank N.A., 2021 WL 3932257, at *10 (C.D. Cal. June 8, 2021).

[5] In comparison, in Wells Fargo, there were over 2.6 million *potential* loan files that fell under the Non-Statutory Class definition and a $45 million Settlement Fund.  Herrera, 2021 WL 3932257, at *9.

1   Settlement's benefits far outweigh the risks, costs and delay of continued litigation which
2   might otherwise overwhelm any potential additional benefits the Class could hope to
3   obtain.

4        For the reasons set forth herein, Plaintiffs request the Court: (1) certify the proposed
5   Class (including the Statutory Class and Non-Statutory Class) for settlement purposes only;
6   (2) grant preliminary approval of the Settlement so that Notice of the Settlement may be
7   provided to the Class, (3) approve the form and manner of Notice to the Class; (4) appoint
8   Plaintiffs and their counsel as the Class Representatives and Class Counsel; (5) appoint
9   Atticus Administration LLP ("Atticus") to serve as the Settlement Administrator; and
10  (6) set the relevant deadlines for a Final Approval Hearing.

11  **II.      STATEMENT OF FACTS**

12       **A.      Summary of the Allegations and Defenses.**

13       Plaintiffs and the Class entered into automobile retail installment contracts ("Finance
14  Agreements") with Guaranteed Asset Protection ("GAP") that were sold and assigned to
15  TMCC.  Second Amended Complaint ("SAC"), ¶ 38, Dkt. 58.  GAP is an addendum to a
16  customer's Finance Agreement.  Id., ¶ 4.  It provides that if a customer's car is stolen or
17  "totaled" and the insurance payout on the vehicle is less than the amount owed under the
18  Finance Agreement, then the creditor (TMCC) will waive the difference.  Id.

19       Customers are charged for GAP coverage for the full term of the Finance Agreement
20  as part of the amount financed.  SAC, ¶ 6.  According to the lawsuit, customers are entitled
21  to a partial credit or refund of the amount charged for GAP coverage if the Finance
22  Agreement is paid off early (an "Early Payoff") or if the GAP coverage is otherwise
23  cancelled before the Finance Agreement's maturity date.  Id., ¶¶ 7, 10-11.  The cost for the
24  unused portion of GAP coverage is referred to by TMCC and the automobile finance
25  industry as "unearned" GAP fees.  Id.

26       Plaintiffs allege that TMCC was contractually required to issue a credit or refund of
27  unearned GAP fees after an Early Payoff, because an Early Payoff automatically cancels
28  the GAP coverage.  SAC, ¶¶ 10-11, 41-42.  Plaintiffs further allege that an Early Payoff

constitutes sufficient notice to TMCC that a credit or refund is due, thereby satisfying any contractual notice prerequisites for a refund to the extent such conditions are expressly set forth in the GAP addendum.  Id., ¶¶ 9-11, 45-46.  Plaintiffs further contend that certain States have laws, regulations, or guidance that required TMCC to automatically issue a GAP Refund after an Early Payoff ("Automatic Refund Requirements").  Id., ¶ 11(e).

TMCC denies any wrongdoing in this lawsuit.  TMCC contends that unless the GAP Agreement is subject to an Automatic Refund Requirement, customers are required to provide a separate written request to cancel their GAP Agreement or a written request for a refund as a condition precedent for the refund and, according to TMCC, tendering payoff funds does not satisfy this requirement.  TMCC also disputes whether certain States had Automatic Refund Requirements in effect that required TMCC to issue a GAP Refund after an Early Payoff.

**B.  Procedural History.**

The initial complaint in this action was filed on November 17, 2020 against TMCC and its related company, Toyota Motor Insurance Services ("TMIS").  Dkt. 1.  The lawsuit was deemed related to the then-pending Wells Fargo matter -- which likewise concerned allegations that Wells Fargo failed to pay GAP refunds after an Early Payoff -- and was reassigned to this Court on November 18, 2020.  Dkt. 5, 12.

On January 11, 2021, TMCC and TMIS filed a motion to dismiss Plaintiff's initial complaint.  Dkt. 20.  On February 8, 2021, the parties entered a stipulation whereby TMCC agreed to stipulate to certain facts for purposes of the lawsuit.  Frank Decl., ¶ 11.  In exchange, Plaintiffs agreed they would file an amended complaint that, among other things, dismissed TMIS from the lawsuit, without prejudice, dismissed certain claims and would withdraw the Complaint's alter ego allegations.  Id.

On February 16, 2021, Plaintiffs filed their First Amended Complaint asserting claims for (1) breach of contract on behalf of a nationwide class, (2) declaratory relief on behalf of customers whose GAP Agreements were subject to an Automatic Refund Requirement and (3) violations of California's Consumer Legal Remedies Act and Unfair

1   Competition Law on behalf of a California subclass.  Dkt. 25, 26.

2          On March 3, 2021, TMCC filed its Answer and Affirmative Defenses to Plaintiffs'

3   First Amended Class Action Complaint denying any wrongdoing.  Dkt. 32.

4          The parties thereafter engaged in substantial written and deposition discovery,

5   including:

6    - Reviewing and analyzing over 20,486 pages of documents, not including

7      spreadsheets, which were produced on the following dates: July 2, 2021, July

8      15, 2021, August 20, 2021, August 31, 2021, November 19, 2021, December

9      20, 2021, December 24, 2021, December 30, 2021, January 21, 2022, January

10     24, 2022, January 26, 2022, January 30, 2022, January 31, 2022, February 2,

11     2022, February 4, 2022, February 17, 2022, and March 11, 2022;

12   - Reviewing and analyzing data for over 1.1 million Finance Agreements with

13     GAP protection that were paid off early during the time period January 1, 2016

14     through October 25, 2021;

15   - Deposing five TMCC and TMIS witnesses over multiple days;

16   - Contacting and interviewing TMCC customers as part of a Court approved

17     sampling project;

18   - Propounding and responding to special interrogatories and document

19     requests;

20   - Serving and preparing motions to compel TMCC to respond to Plaintiffs'

21     interrogatories and document requests; and

22   - Working with Attorney Generals throughout the United States investigating

23     GAP Refund practices.

24   Frank Decl., ¶ 13.

25         The parties reached a settlement of this lawsuit shortly before Plaintiffs' deadline to

26   file their motion for class certification.  Frank Decl., ¶ 14.  The parties stipulated to

27   Plaintiffs filing a Second Amended Complaint to conform with the Settlement, which was

28   filed on June 16, 2022.  Dkt. 55, 55-1, 58.

13

**C.  History of the Settlement Negotiations.**

The settlement negotiations in this case have been extensive, arms-length and with the assistance of two former federal judges as mediators.  Frank Decl., ¶ 15.

On August 4, 2021, the parties attended a full-day mediation before the Honorable Jay C. Gandhi (Ret.).  Frank Decl., ¶ 16.  Unfortunately, the parties were unable to reach a settlement.  Id.

On March 15, 2022, after the close of class discovery, the parties engaged in a second mediation, this time before the Honorable Andrew J. Guilford (Ret.).  Frank Decl., ¶ 17.  Judge Guilford served as the mediator in the Wells Fargo matter and was the former presiding judge over that matter before his retirement, so he had considerable experience with the related claims asserted in this case.  Id.  After a full-day mediation, the parties were able to reach an agreement on all material terms for the Settlement Class and entered a binding term sheet.  Id.  The parties thereafter drafted a long-form Settlement Agreement, with the only missing term concerning attorneys' fees.

On May 12, 2021, the parties returned to mediation before Judge Guilford concerning attorneys' fees.  Frank Decl., ¶ 18; Settlement, ¶ 81.  Prior to the session, the parties submitted briefing and evidence regarding an appropriate fee award.  Id. At the conclusion of the session, Judge Guilford issued a mediator's proposal recommending that an appropriate fee award would be **$19 million**, with the understanding that this Court has the sole authority to make this determination.  Id.  Plaintiffs' counsel agreed to accept Judge Guilford's proposal and agreed to limit their request to this amount.  Id.  TMCC is reserving its right to oppose this request.  Id.

**D.  The Settlement.**

**1.  Definition of the Settlement Classes.**

The Settlement Class (also referred to as the "Class") includes two groups: the Statutory Class and the Non-Statutory Class.  Settlement, ¶ 10.

The Statutory Class includes all persons in the United States: (a) who entered into Finance Agreements with GAP protection in the States of Alabama, Colorado, Indiana,

Iowa, Massachusetts, New Jersey, Oklahoma, Oregon, Texas, Vermont, Wisconsin or Wyoming; (b) whose agreements were assigned to TMCC; (c) who paid off their Finance Agreements at least 30 days prior to the original maturity date (an "Early Payoff"); (d) whose Early Payoffs occurred during the Statutory Class Period; and (e) who did not receive a GAP Refund or suffer a total loss of their Vehicle during the term of their Finance Agreement.  Settlement, ¶ 60.  The Statutory Class Periods vary by State depending on the later of: (i) the date the applicable State's Automatic Refund Requirement went into effect; (ii) the beginning of the applicable State's statute of limitations period for breach of contract claims; or (iii) January 1, 2016.  Id., ¶ 61.  The applicable dates for the Statutory Class Period are set forth in **Exhibit A** to the Settlement.  Id.

The Non-Statutory Class includes all persons in the United States: (a) who entered into Finance Agreements with GAP protection; (b) whose agreements were assigned to TMCC; (c) who paid off their Finance Agreements at least 30 days prior to the original maturity date (an "Early Payoff"); (d) whose Early Payoffs occurred during the period **January 1, 2016** through **October 25, 2021**; and (e) who did not receive a GAP Refund or suffer a total loss of their Vehicle during the term of their Finance Agreement.  Settlement, ¶ 44.  The Non-Statutory Class also excludes any persons whose Vehicle is covered by the Statutory Class definition.  Id.

### 2.     Consideration for the Settlement.

The Settlement provides for the following benefits in exchange for the Release of the claims in this lawsuit.

- **Business Practice Change.**  Commencing on **October 25, 2021** (approximately one-year after the filing of this lawsuit), TMCC implemented changes to its refund practices so that it now automatically and directly provides GAP Refunds to customers in all U.S. States within a reasonable time after receipt of an Early Payoff, provided such payoff occurs more than thirty (30) days prior to the original maturity date of the Finance Agreement.  Settlement, ¶ 102.  Customers are not required to take any action to seek a refund and no cancellation fee is charged unless provided for in the

customer's GAP Agreement.  <u>Id.</u>  The Business Practice Change applies to all customers whose Finance Agreements with GAP protection have been or will be assigned to TMCC. <u>Id.</u>  TMCC agrees it will not materially change this practice for at least four years after the Settlement's Effective Date, and it will not revert back to a State-by-State approach during this four-year period.  <u>Id.</u>  Plaintiffs' expert estimates that TMCC will pay at least **$275.85 million** in refunds during this four-year period that it was not paying prior to the filing of this lawsuit.  Baggett Decl., ¶¶ 15, 34-36.

- **Statutory Class.**  TMCC will directly pay each member of the Statutory Class the full amount of their GAP Refund without any deduction for cancellation fees, plus interest at the applicable State-specific pre-judgment interest rate, which such interest will accrue from the date of the Early Payoff to the date the GAP Refund is issued by TMCC. Settlement, ¶ 103.  Upon completion of these refund payments, TMCC will provide a declaration to the Settlement Administrator and Class Counsel verifying the refund payments have been completed.  <u>Id.</u>  The declaration will include a list of Statutory Class members, the amount of their GAP Refund and the interest.  <u>Id.</u>  Any checks that were returned or not cashed will be handled in accordance with the applicable State's unclaimed property/escheatment laws.  <u>Id.</u>  The members of the Statutory Class will not be required to submit a Claim Form for their GAP Refunds because TMCC can reasonably determine from its own records that such individuals are part of the Statutory Class.  <u>Id.</u>  Based on the most recent data provided by TMCC, Plaintiffs' expert estimates that TMCC will pay over **$19.1 million** (**$19,164,163.03**) to the Statutory Class.  Baggett Decl., ¶¶ 14, 28.  TMCC is conducting a final account level review of the Statutory Class's loan files and this figure is subject to change.  <u>Id.</u>  The parties will provide the Court with the final numbers in the Motion for Final Approval.

- **Non-Statutory Class.**  Each member of the Non-Statutory Class will be eligible to submit a claim for up to the full amount of their GAP Refund, without any deduction for cancellation fees, to be paid from the Settlement Fund.  Settlement, ¶ 104. In order to receive the GAP Refund, each Non-Statutory Class member will be required to

submit a completed and signed Claim Form to the Settlement Administrator by the Claim Form Deadline verifying under penalty of perjury that: (a) they purchased GAP protection for the Vehicle identified on their Claim Form; (b) they did not suffer total loss of the Vehicle during the term of the Finance Agreement; and (c) they did not previously receive a GAP Refund from TMCC, a Dealer, a GAP Administrator or any other third-party for that Vehicle.  Id.  The members of the Non-Statutory Class are being required to submit a Claim Form verifying the information set forth above because TMCC cannot reasonably and systematically determine from its records whether these customers qualify for a GAP Refund under the terms of the Settlement.  Id.

- **Settlement Fund.**  TMCC will establish a non-reversionary Settlement Fund totaling **$59 million** to pay for: (a) Approved Claims for GAP Refunds to Non-Statutory Class members; (b) Notice and Administration Costs; (c) Fee and Expense Awards approved by the Court; and (d) Service Awards approved by the Court.  Settlement, ¶ 105.

The Net Settlement Fund is the amount of money that remains in the Settlement Fund after the deduction of any Notice and Administrative Costs, Fee and Expense Awards and Service Awards approved by the Court.  Id., ¶ 109.  If the amount of the Net Settlement Fund is not sufficient to fully cover the Approved Claims for GAP Refunds to the Non-Statutory Class members, then the individual GAP Refund amounts will be reduced on a prorated basis.  Each Non-Statutory Class member's individual payment from the Settlement Fund will be reduced by the same percentage.  For example, if the combined total of Approved Claims is ten percent (10%) greater than the Net Settlement Fund, then each individual's GAP Refund will be reduced by ten percent (10%).

- **Notice and Administrative Costs.**  The Notice and Administration Costs shall be paid from the Settlement Fund.  Settlement, ¶ 106.  The Settlement Administrator has agreed that the Notice and Administration Costs will not exceed **$800,000**, unless specifically approved by the Court and the parties.  Id.

- **Fee and Expense Award.**  Plaintiffs' counsel will be seeking a Fee Award of **$19 million**, and an Expense Award of no more than **$150,000**.  Settlement, ¶ 145.  TMCC

17

reserves its right to oppose this fee request.  Id.  Any Fee and Expense Awards approved by the Court will be paid from the Settlement Fund.  Id., ¶ 107.

- **Service Awards.**  The Settlement provides for a Service Award of **$2,500** to the two named Plaintiffs, William Martin and Lori Mitchell subject to the approval of this Court.  Settlement, ¶ 148.  Any Service Awards approved by the Court will be paid from the Settlement Fund.  Id., ¶ 108.

### 3. Release.

Unless a Class member timely Requests Exclusion from the Class ("Opt-Out"), Plaintiffs and each and every Class member (including both the Statutory Class and Non-Statutory Class), individually or together, and each and every one of their former, present, or future agents, predecessors, successors, heirs, legatees, executors, administrators, insurers, assigns, trustees, spouses, and domestic partners ("Class Releasors") will release and fully discharge TMCC and TMIS, and each of their former, present, or future agents, insurers, predecessors, successors, subsidiaries, parent company(ies), affiliates, officers, directors, and employees and attorneys ("Class Releasees") from any and all past and/or present claims, counterclaims, lawsuits, set-offs, costs, losses, rights, demands, charges, complaints, actions, causes of action, obligations, or liabilities of any and every kind, whether class, individual, or otherwise in nature, including, without limitation, those known or unknown or capable of being known; those which are unknown but might be discovered or discoverable based upon facts other than or different from those facts known or believed at this time; those which are foreseen or unforeseen, suspected or unsuspected, asserted or unasserted, and/or contingent or non-contingent; and those which are accrued, unaccrued, matured or not matured, under the laws of any jurisdiction, which they, whether directly, representatively, derivatively, or in any other capacity, ever had, now have, or hereafter can, shall, or may have, arising from or relating in any way to the Class member's entitlement to a GAP Refund after an Early Payoff that occurred during the Class Period or Statutory Class Period, as appropriate (the "Class Released Claims").  Settlement, ¶ 97. For clarification, the Class Releasees do not include any Dealers or GAP Administrators

(other than TMIS), including without limitation, those identified in the Class members' GAP Agreements or Finance Agreements.  Id.  In other words, the Settlement Class will preserve any potential claims against those entities.  Id.

### 4.   Settlement Administrator.

The parties have selected Atticus to serve as the Settlement Administrator subject to this Court's approval.  Settlement, ¶ 57.  Atticus's experience and qualifications are set forth in the Declaration of Christopher Longley ("Longley Decl.") filed herewith.

### 5.   Notice Plan.

Within fourteen (14) days after the Court issues its Preliminary Approval Order, or by an alternative deadline ordered by the Court, the Settlement Administrator will mail, via first-class mail, and email (where email addresses are available) the Notice of Settlement to each potential Class member.  Settlement, ¶ 119.  The Settlement Administrator will use reasonable efforts to update and confirm the accuracy of the Class members' contact information through the USPS change of address system prior to mailing the Notice of Settlement.  Id., ¶ 117.  If any mailed Notice of Settlement is returned as non-delivered, without a forwarding address, then the Settlement Administrator will use standard skip-tracing techniques to locate the updated address for re-mailing.  Id., ¶ 120.

The Notice of Settlement will be a postcard notice in substantially the same form and with substantially the same content as **Exhibit E** (the "Non-Statutory Class Notice") and **Exhibit F** (the "Statutory Class Notice") to the Settlement, subject to Court approval. Settlement, ¶ 118.  The Notice of Settlement will be customized for each potential Class member so that it includes, among other information, (a) a unique Identification Number for each potential Class member, (b) the Vehicle covered by the Settlement and (c) the estimated maximum GAP Refund (or, in the case of the Statutory Class Notice, the actual or estimated GAP Refund plus the applicable interest).  Id.  The Notice of Settlement will also include a QR code that Class members can scan to link directly to the Settlement Website.  Id.  The email Notice of Settlement will also contain a link allowing potential Class members to directly access the Settlement Website.  Id.

Concurrently with the mailing of the Notice of Settlement, the Settlement Administrator will establish a Settlement Website.  Settlement, ¶ 121.  The Settlement Website will include a Long Form Notice with details about the Settlement and instructions for submitting Claim Forms, Requests for Exclusion and Objections, among other information.  Id.  The Long Form Notice  will be in substantially the same format and with substantially the same content as **Exhibit D** to the Settlement, subject to Court approval.  Id., ¶ 43.  The Settlement Website will also enable Non-Statutory Class members to electronically complete and submit a Claim Form or print the Claim Form to be mailed to the Settlement Administrator.  Id., ¶ 121.  In addition, the Settlement Website will include the Settlement Agreement, this Motion, the Second Amended Complaint and other key pleadings, including the Preliminary Approval Order.  Id.

In addition to mailing Notice of the Settlement, the Settlement Administrator will also publish Digital Advertisements about the Settlement on targeted websites (such as FaceBook, Google, etc.) that will link to the Settlement Website.  Settlement, ¶ 122, Ex. C.  The Digital Advertisements will run each week during the Claims Period.  Id.  A sample of the Digital Advertisements are attached as **Exhibit C** to the Settlement.  Id.

### 6. Claims Period and Process.

The Claims Period will be sixty (60) days starting from the mailing of the Notice of Settlement.  Settlement, ¶ 9.  Only Non-Statutory Class members will be required to submit a Claim Form, because TMCC cannot reasonably and systematically determine from its records whether these customers qualify for a GAP Refund under the terms of the Settlement (in contrast to the Statutory Class).  Id., ¶¶ 103-104.

The Claim Form will be in substantially the same form and with substantially the same content as **Exhibit B** to the Settlement, subject to Court approval.  Settlement, ¶ 123.  The Claim Form will be customized so that it identifies the Vehicle covered by the Settlement and the estimated maximum GAP Refund.  Id. The Non-Statutory Class members will be required to check three boxes verifying that: (a) they purchased GAP protection for the Vehicle identified on their Claim Form; (b) they did not suffer a total

loss of the Vehicle identified on their Claim Form during the term of the Finance Agreement; and (c) they did not previously receive a GAP Refund from TMCC, a Dealer, a GAP Administrator or any other third party for that Vehicle. Id. The Non-Statutory Class members will also be required to sign the Claim Form verifying under penalty of perjury that the information in the Claim Form is accurate. Id. The Claim Form will further request the Non-Statutory Class members provide the best telephone number or email to contact them if there are any issues with their Claim Form, but they are not required to provide this information in order have their Claim Form approved. Id.

To make the Claims Process as easy and user-friendly as possible, Non-Statutory Class members will be able to complete and submit their Claim Form electronically on the Settlement Website (which can be easily accessed by scanning the QR Code on the Notice of Settlement or clicking a link on the Email-Notice.) Settlement, ¶ 124. If a Non-Statutory Class member fails to check a box or sign the Claim Form, they will be automatically notified they need to complete that portion before they can submit the Claim Form. Id. Upon completion of the Claim Form, the Non-Statutory Class members will be asked whether they want their Settlement payment distributed electronically (through services such as PayPal, Venmo, etc.) or if they want a check mailed to their home address. Id. The Non-Statutory Class members will also have the option of printing the Claim Form from the Settlement Website or requesting the Settlement Administrator mail or email it to them, so they can complete and mail a hard copy of the Claim Form to the Settlement Administrator or upload it on the Settlement Website. Id. All Claim Forms must be submitted or post-marked on or before the Claims Deadline to be valid and approved (60 days after the mailing of the Notice of Settlement). Id.

**7.    Opt-Out / Objection Process.**

Class members will have sixty (60) days after the mailing of the Notice of Settlement to Request Exclusion ("Opt-Out") from the Settlement or to file an Objection to the Settlement (the "Exclusion/Objection Deadline"). Settlement, ¶¶ 28, 128, 134. All Requests for Exclusion must be made in writing and signed by the Class member and

mailed to the Settlement Administrator with a post-mark date on or before the Exclusion/Objection Deadline. Id., ¶ 128-129.

Class members who do not Request Exclusion from the Settlement may submit a written objection to the Settlement signed by the Class member (an "Objection"). Settlement, ¶ 134. The Objections must include the reason(s) for the objections and any supporting authority. Id., ¶ 135. To be valid, the Objections must be mailed to the Settlement Administrator and post-marked no later than the Exclusion/Objection Deadline. Id. ¶ 134. The Objections must also be filed with the Court and served on counsel for the parties by the Exclusion/Objection Deadline. Id. Objectors must also file a Notice of Intent to Appear with the Court by the Exclusion/Objection Deadline if they wish to speak at the Final Approval Hearing. Id. ¶ 137. In addition, if an Objection is being filed by a lawyer on the Class member's behalf, the lawyer must also file a Notice of Appearance with the Court by the Exclusion/Objection Deadline which includes a declaration attesting that the lawyer represents the Class member and specifying the number of times during the prior five-year period that the lawyer has objected to a class action settlement on his or her own behalf or on behalf of a class member. Id. ¶ 136. Detailed instructions for the Opt-Out/Objection process will be included in the Long Form Notice on the Settlement Website. Id., Ex. D.

## III.  LEGAL STANDARD

Pursuant to Rule 23(e),[6] class action settlements must be approved by the Court. Herrera, 2021 WL 3932257, at *4. "At the preliminary approval stage, a court determines whether a proposed settlement is within the range of possible approval and whether or not notice should be sent to class members." True v. Am. Honda Motor Co., 749 F. Supp. 2d 1052, 1063 (C.D. Cal. 2010). "The parties must provide the court with information sufficient to enable it to determine whether to give notice of the propos[ed] [settlement] to the class." Herrera, 2021 WL 3932257, at *4. "The court must direct notice in a reasonable

---

[6] All references to "Rules" are to the Federal Rules of Civil Procedure.

1    manner to all class members who would be bound by the proposal if giving notice is
2    justified by the parties' showing that the court will likely be able to: (i) approve the
3    propos[ed] [settlement] under Rule 23(e)(2); and (ii) certify the class for purposes of
4    judgment on the proposal." Id.

5    ## IV.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

6         Before granting preliminary approval of a class action settlement, the Court must
7    first determine whether the proposed Settlement Class is likely to meet the requirements
8    for class certification.  Fed. R. Civ. P. 23(e)(1)(B)(ii).  Certification requires that all four
9    elements of Rule 23(a) and at least one prong under Rule 23(b) are satisfied.  Herrera, 2021
10   WL 3932257, at *4.

11        ### A.    The Proposed Settlement Class Meets the Rule 23(a) Requirements.

12        To satisfy the four perquisites of Rule 23(a), Plaintiffs must demonstrate: (1) the
13   members of the proposed class are so numerous that joinder of all claims would be
14   impracticable (numerosity); (2) there are be questions of law and fact common to the class
15   (commonality); (3) the claims or defenses of the representative parties are be typical of the
16   claims or defenses of absent class members (typicality); and (4) the representative parties
17   will fairly and adequately protect the interests of the class (adequacy).  Herrera, 2021 WL
18   3932257, at *4.

19        #### 1.    Numerosity

20        Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is
21   impracticable.'"  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  Based
22   on TMCC's current records, there are approximately **43,142 loan files** that fall under the
23   Statutory Class definition.  Baggett Decl., ¶ 20.[7]  There are also *potentially* **628,485 loan**

24   _____

25   [7] The data provided to Plaintiffs did not include the customers' names or contact
     information, only a unique identification number for each loan file.  Baggett Decl., ¶ 22.
26   The numbers provided above are based on the number of loan files that fall under the Class
     definitions.  Id.  Because there will be some "Repeat Customers" in this group (i.e.,
27   customers who entered more than one Finance Agreement with TMCC), the class size will
     be lower than the numbers provided above, but not enough to defeat numerosity.  Id.  For

**files** that fall under the Non-Statutory Class definition (we will not know the number of Non-Statutory Class members until these customers submit a Claim Form verifying they did not receive a GAP Refund from a third-party Dealer or GAP Administrator or suffer a total loss of their Vehicle). <u>Id.</u>  This is more than enough to satisfy numerosity, which generally requires no more than forty members.  <u>Vinh Nguyen v. Radient Pharmaceuticals Corp.</u>, 287 F.R.D. 563, 569 (C.D. Cal. 2012) ("[A] proposed class of at least forty members presumptively satisfies the numerosity requirement.").

### 2.    Commonality

Rule 23(a)(2)'s commonality requirement is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  <u>Hanlon</u>, 150 F.3d at 1019.  A common question "must be of such a nature that it is capable of classwide resolution -- which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."  <u>Wal-Mart v. Dukes</u>, 564 U.S. 338, 350 (2011).  There must be at least "a single common question" to satisfy the commonality requirement.  <u>Wang v. Chinese Daily News</u>, 709 F.3d 829, 834 (9th Cir. 2013).

The present case challenges TMCC's uniform policy of collecting unearned GAP fees as part of an Early Payoff, and its refusal to issue a refund of those fees unless the customer sends a separate written notice of cancellation or request for a refund. SAC, ¶¶ 1, 8, 28.  It also challenges TMCC's failure to comply with the Automatic Refund Requirements in 12 States.  <u>Id.</u>, ¶¶ 11(e), 52-63, 89-84.  The primary issues in dispute are whether TMCC, as the assignee of the GAP Agreement, assumed the GAP Agreement's contractual and/or legal obligation to issue a refund of unearned GAP fees after an Early Payoff and whether TMCC's policy to collect and fail to refund unearned GAP fees constitutes a breach of contract and violation of the applicable State's Automatic Refund

---

example, in <u>Wells Fargo</u>, approximately 5.63% of the Class included "repeat customers." <u>Id.</u>, ¶ 38.

1  Requirements.  SAC, ¶ 11.  In <u>Wells Fargo</u>, this Court found the same fact pattern and these

2  same legal questions satisfied Rule 23(a)(2)'s commonality requirement.  <u>Herrera</u>, 2021

3  WL 3932257, at *5.

### 3.   Typicality

5  Rule 23(a)(3) requires that "the claims or defenses of the representative parties are

6  typical of the claims or defenses of the class."  <u>Hanlon</u>, 150 F.3d at 1020.  To meet the

7  typicality requirement, the plaintiffs must show that (1) "other members have a similar

8  injury"; (2) "the action is based on conduct that is not unique to the named plaintiffs"; and

9  (3) "other class members have been injured by the same course of conduct." <u>Ellis v. Costco</u>

10  <u>Wholesale Corp.</u>, 657 F.3d 970, 984 (9th Cir. 2011). "Under the rule's permissive

11  standards, representative claims are 'typical' if they are reasonably co-extensive with those

12  of the absent class members; they need not be substantially identical."  <u>Hanlon</u>, 150 F.3d

13  at 1020 (internal quotations omitted).

14  Here, Plaintiff William Martin suffered the same injury as the Non-Statutory Class

15  members.  SAC, ¶ 17; Declaration of William Martin ("Martin Decl."), ¶ 3.  TMCC

16  collected unearned GAP fees from Mr. Martin as part of an Early Payoff and failed to issue

17  a refund of those fees as part of its standard corporate policy not to issue a refund unless

18  the customer sends a subsequent written notice of cancellation or request for a refund; i.e.,

19  the same practice that similarly harmed all other Non-Statutory Class members.  <u>Id.</u>

20  Likewise, Plaintiff Lori Mitchell suffered the same injury as the Statutory Class members.

21  SAC, ¶ 18; Declaration of Lori Mitchell ("Mitchell Decl."), ¶ 3.  Her GAP Agreement was

22  governed by an Automatic Refund Requirement (Colorado), and TMCC failed to issue her

23  a GAP Refund after her Early Payoff, and it did not pay her interest on those unpaid

24  amounts, i.e., the same injury incurred by the other Statutory Class members.  <u>Id.</u>  In <u>Wells</u>

25  <u>Fargo</u>, this Court found that similar facts satisfied typicality.  <u>Herrera</u>, 2021 WL 3932257,

26  at *6.

### 4.   Adequacy

28  Rule 23(a)(4) requires that "the representative parties will fairly and adequately

protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Representation is fair and adequate if (a) the named plaintiffs and their counsel are able to prosecute the action vigorously; (b) the named plaintiffs do not have conflicts of interest with the unnamed class members; and (c) the attorneys representing the class are qualified and competent. Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Here, the named Plaintiffs and Class Counsel do not have any known conflicts of interests with the Class, and the Class Representative's claims are based on the same conduct that affected the rest of the Class.  Frank Decl. ¶ 25, Martin Decl., ¶ 6; Mitchell Decl., ¶ 6.  Plaintiffs are represented by experienced Class Counsel who have vigorously litigated this case on behalf of the Class, and who have been previously approved by this Court as Class Counsel in the substantively identical Wells Fargo class action concerning GAP refunds.  Frank Decl., ¶¶ 8(a), 24.  Thus, the adequacy requirement is satisfied.

**B.**     **The Proposed Settlement Class Satisfies Rule 23(b)(3).**

Plaintiffs contend that the proposed Class is maintainable under Rule 23(b)(3).  This requires Plaintiffs to show that (a) common factual and legal issues predominate over individual questions and (b) a class action is a superior method to resolve class claims. Fed. R. Civ. P. 23(b)(3).

"The criteria for class certification are applied differently in litigation classes and settlement classes." In re Hyundai, 926 F.3d 539, 556–57 (9th Cir. 2019).  "In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial." Id.  In contrast, "such manageability issues are not a concern in certifying a settlement class where, by definition, there will be no trial." Id.  Thus, "[b]ecause the Settlement Class is certified solely for purposes of settlement, the Court need not address any issues of manageability for litigation purposes." Schmitt v. Younique, LLC, 2020 WL 1812354, at *2 (C.D. Cal. Apr. 9, 2020) (J. Selna).

### 1. Common Factual and Legal Issues Predominate Over Individual Questions.

Rule 23(b)(3)'s predominance requirement is satisfied when common questions present a significant portion of the case and can be resolved for all members in a single adjudication. Hanlon, 150 F.3d at 1022. As noted above, in the present case, the primary issues in dispute are whether TMCC, as the assignee of the GAP Agreement, assumed the GAP Agreement's contractual and/or legal obligation to issue a refund of unearned GAP fees after an Early Payoff and whether TMCC's policy to collect and fail to refund unearned GAP fees constitutes a breach of contract and violation of the applicable State's Automatic Refund Requirements. SAC, ¶ 11. As alleged in the SAC, the GAP Agreements are standard form contracts that provide for a GAP Refund when the Finance Agreement is cancelled or terminated prior to the maturity date. Id., ¶¶ 11(e), 41.

"Courts routinely certify class actions involving breaches of form contracts." In re Medical Capital Securities Litigation, 2011 WL 5067028 at *3 (C.D. Cal. July 26, 2011). This is especially the case when "they involve form contracts and standardized policies and practices applied on a routine basis to all customers by a bank." Ellsworth v. U.S. Bank, N.A., 2014 WL 2734953 at *22-23 (N.D. Cal. June 13, 2014) (citing Gutierrez v. Wells Fargo Bank, 2008 WL 4279550, at *17 (N.D. Cal. Sept. 11, 2008).) Further, because "courts have recognized that the law relating to the elements of a claim for breach of contract do not vary greatly from state to state," courts will routinely certify breach of contract claims on a nationwide or multi-state basis. See, e.g., Feller v. Transamerica Life Insurance Co., 2017 WL 6496803, at *6 (C.D. Cal. Dec. 11, 2017). Even where there are multiple versions of form contracts, courts will certify breach of contract claims on a multi-state basis where, as here, customers were subject to the same policy by the defendant. See e.g., Allapattah Servs., Inc. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Cir.2003); Vedachalam v. Tata Consultancy Serv's, Ltd., 2012 WL 1110004, at *13-15 (N.D. Cal. 2012) (certifying nationwide class even though there were variations in contract forms,

1    because defendant had the same policy for all customers).

2        In <u>Wells Fargo</u>, this Court found the predominance element was satisfied based on

3    the same fact pattern at issue in the present case against TMCC.  <u>Herrera</u>, 2021 WL

4    3932257, at *7.  The Court found that "[t]he same evidence can be used to resolve liability

5    issues for all Class members because the Class members' claims stem from Wells Fargo's

6    consistent policy of not refunding unearned GAP fees after an Early Payoff."  <u>Id.</u>  The

7    Court also found that the Automatic Refund Requirements in the relevant States are

8    "substantially similar, meaning that common questions of law will predominate for the

9    Statutory Subclass."  <u>Id.</u>  The Court also noted "[a]t a more general level, courts routinely

10   grant certification for class actions involving form contracts, particularly where the

11   defendant is a bank with a similar practice for all customers."  <u>Id.</u>  All of these common

12   issues of fact and law likewise predominate in the present case.  <u>Supra</u>, § IV.A.2.

13                    **2.      A Class Action is Superior.**

14       "A class action is the superior method for managing litigation if no realistic

15   alternative exists."  <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234–35 (9th Cir.

16   1996).   This superiority inquiry requires a comparative evaluation of alternative

17   mechanisms of dispute resolution.  <u>Hanlon</u>, 150 F.3d at 1023.  Rule 23(b)(3) provides a

18   non-exhaustive list of factors relevant to the superiority analysis that require courts to

19   consider: (a) the interest of members of the class in individually controlling the prosecution

20   or defense of separate actions; (b) the extent and nature of any litigation concerning the

21   controversy already commenced by or against members of the class; (c) the desirability or

22   undesirability of concentrating the litigation of the claims in the particular forum; and

23   (d) the difficulties likely to be encountered in the management of a class action.  <u>Herrera</u>,

24   2021 WL 3932257, at *7.

25       Here, there is no evidence that class members have any interest in individually

26   controlling their cases.  Frank Decl., ¶ 26.  Plaintiffs are not aware of any related pending

27   litigation against TMCC.  <u>Id.</u>  The Class includes tens of thousands, if not hundreds of

28   thousands, of Class members.  Baggett Decl., ¶¶ 20-21.  "It is therefore clearly superior to

resolve these claims in a single class action instead of flooding the courts with claims brought by each Class member." Herrera, 2021 WL 3932257, at *7 (quoting Wren v. RGIS Inventory Specialists, 256 F.R.D. 180, 210 (N.D. Cal. 2009) (finding a class action to be superior when "[t]he alternative – hundreds or even thousands of individual actions – is not realistic").) Further, the relatively small amounts at issue in this lawsuit (the average refund amount is $349), render it economically unfeasible to litigate these claims on an individual basis. Frank Decl., ¶ 27; Baggett Decl., ¶ 32; Hanlon, 150 F.3d at 1023 (noting that a class action is superior when the cost of individuals actions would "dwarf [the] potential recovery"). As such, the superiority element is satisfied.

## V.    THE COURT SHOULD GRANT PRELIMINARY APPROVAL

The Court may only grant preliminary approval of a settlement by finding it is fair, reasonable and adequate. Fed.R.Civ.P. 23(e)(2); Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). To make this determination, the Court must consider the following factors: (1) the class representatives and class counsel have adequately represented the class; (2) the settlement was negotiated at arm's length; (3) the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal, (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (4) the proposal treats class members equitably relative to each other. Herrera, 2021 WL 3932257, at *7-8.

Before the revisions to Rule 23(e), the Ninth Circuit had developed its own list of factors to be considered. See e.g. In re Bluetooth Headset Products Liab. Litig., 654 F.3d 935, 964 (9th Cir. 2011). The revised Rule 23 "directs the parties to present [their] settlement to the court in terms of [this new] shorter list of core concerns." Herrera, 2021 WL 3932257, at *8. "The goal of [amended Rule 23(e)] is . . . to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Id.

### A.     Adequacy of Representation.

Under Rule 23(e)(2)(A), the first factor to consider is whether the class representatives and class counsel have adequately represented the class.  Herrera, 2021 WL 3932257, at *8.  This analysis includes "the nature and amount of discovery" undertaken in the litigation.  Id.

As noted above, the parties have engaged in substantial discovery, including: (1) reviewing and analyzing over 20,486 pages of documents, not including spreadsheets; (2) reviewing and analyzing data for over 1.1 million Finance Agreements with GAP protection that were paid off early during the time period January 1, 2016 through October 25, 2021; (3) taking five witness depositions; and (4) propounding and responding to voluminous special interrogatories and document requests.  Frank Decl., ¶ 13.  The case only settled after the completion of Class discovery and the preparation of Plaintiffs' motion for class certification.  Id., ¶¶ 14, 35  Moreover, the litigation of the claims against TMCC was substantially aided by the motion practice, discovery and Court decisions in the related Wells Fargo matter, which was actively litigated for nearly four years before this Court.  Id.  Based on this knowledge and experience, Plaintiffs' counsel were well informed about the strengths and weakness of the claims against TMCC prior to mediation. Id.  Accordingly, the first factor weighs in favor of preliminary approval.

### B.     Negotiated at Arm's Length.

The second Rule 23(e)(2) factor asks the Court to confirm that the proposed settlement was negotiated at arm's length.  Fed. R. Civ. P. 23(e)(2)(B).  "[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests."  Herrera, 2021 WL 3932257, at *8 (quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes).

In the present case, the parties attended three mediation sessions throughout the litigation, the first before Judge Gandhi and the latter two before Judge Guilford. Frank Decl., ¶¶ 15-18.  Both judges are highly experienced in class action litigation and

well-respected mediators.  Id.  Judge Guilford was also the former judge who presided over the related Wells Fargo matter before retiring from the bench, and was the mediator who successfully resolved that dispute, and thus was particularly familiar with the issues in this case.  Id.  Each of the parties are represented by experienced counsel, and the Settlement was reached after careful consideration of the risks and benefits of continued litigation, with the aid of completed class discovery and this Court's rulings in the related Wells Fargo matter . Id., ¶ 35.  Thus, because the evidence demonstrates the Settlement was the product of arm's length negotiations and not the product of collusion, this factor weighs in favor of preliminary approval.

### C.    Adequacy of the Relief Provided for the Class.

The third Rule 23(e)(2) factor concerns the adequacy of the relief provided for the class, taking into account: (1) the costs, risks and delay of trial and appeal; (2) the effectiveness of any proposed method of distributing relief to the class; (3) the terms of any proposed attorneys' fees and (4) any agreement required to be identified under Rule 23(e)(3).  Herrera, 2021 WL 3932257, at *9.  "Under this factor, the relief 'to class members is a central concern.'"  Id. (citing Fed. R. Civ. P. 23(e)(2)(C), 2018 Advisory Committee Notes.)  As noted in the introduction, the proposed Settlement follows the same structure as the Wells Fargo Settlement approved by this Court but provides substantially more money to the individual Class members.  Frank Decl., ¶ 29.

First, the Settlement provides that the Statutory Class members will receive full GAP Refunds without any deduction for cancellation fees, plus interest at the applicable State-specific pre-judgment interest rate, which such interest will accrue from the date of the Early Payoff to the date the GAP Refund is issued by TMCC.  Settlement, ¶ 103.  This is the *maximum* amount of damages these Statutory Class members could realistically obtain if they prevailed in this lawsuit.  Frank Decl., ¶ 30.  In total, based on the current data provided by TMCC, the Statutory Class will directly receive over **19.1 million** for an

1  average payment of **$444.21** per loan file.[8]   Baggett Decl., ¶ 28;  This is a complete win

2  for the Statutory Class.  Frank Decl., ¶ 30.

3        Second, the Non-Statutory Class members are eligible to receive up to the full

4  amount of their GAP Refund, without any deduction for cancellation fees (typically $50),

5  so long as they submit a Claim Form verifying, *inter alia*, that they did not previously

6  receive a GAP Refund from a third-party Dealer or GAP Administrator or suffer a total

7  loss of their Vehicle prior to paying off their Finance Agreement.   Settlement, ¶ 104.

8  TMCC does not have this information because it is in the possession of third-party auto

9  dealerships and GAP Administrators.  Id.  Based on TMCC's records, there are *potentially*

10 a maximum of **628,485 loan files** that fall under the Non-Statutory Class definition.

11 Baggett Decl., ¶ 21.   Based on these numbers, the average refund owed would be

12 approximately **$347.64 per loan file** (before deducting cancellation fees).  Id., ¶ 32.  These

13 amounts will be paid out of the Net Settlement Fund.  Settlement, ¶ 104.

14       Per the terms of the Settlement, the proposed Settlement Administrator (Atticus

15 Administration LLC), has agreed to cap the Notice and Administration Costs at $800,000.

16 Settlement, ¶ 106.  Consequently, if the Court awards Plaintiffs the amounts they presently

17 intend to request for Fees ($19 million), Expenses ($150,000) and Service Awards

18 ($5,000), then the remaining amount in the Net Settlement Fund will be approximately

19 **$39.055 million**.  Frank Decl., ¶ 32.  As noted above, there are *potentially* a maximum of

20 **628,485 members** in the Non-Statutory Class.  Baggett Decl., ¶ 21.  If every one of these

21 individuals qualified for a GAP Refund under this Settlement (i.e., they never received a

22 GAP refund from a third-party, nor they did suffer a total loss of their Vehicle), then each

23 member would receive an average payment of **$62.19**.  Frank Decl., ¶ 32.  In comparison,

24 in Wells Fargo, the Court found that even a settlement payment of under **$10**.**00** to the

25

26 _____

27 [8] In comparison, the Statutory Class members in the Wells Fargo Settlement received an
average payment of **$316.87**.  Herrera, 2021 WL 3932257, at *10.  This is due in part to the

28 fact that TMCC is agreeing to pay interest at the applicable State prejudgment interest rate
rather than the lower U.S. Treasury rate agreed to in Wells Fargo. Frank Decl., ¶ 30.

Non-Statutory Class would be adequate given these Class members cannot rely on Automatic Refund Requirements to support their claims (in contrast to the Statutory Class). Herrera, 2021 WL 3932257, at *10.

Notwithstanding the foregoing, in Wells Fargo, only approximately 15% of the *potential* Non-Statutory Class members qualified for refunds under the settlement (401,199 approved claims out of 2,678,266 potential Non-Statutory Class members).[9]  Frank Decl., ¶ 33.  A similar rate in the present case will result in each Non-Statutory Class member receiving their full GAP refund without any deduction for cancellation fees.  Id.  Given that cancellation fees will often be greater than the accrued interest, these Non-Statutory Class members would likely be receiving the maximum damages they could obtain if they prevailed at trial.  Id.  This is an outstanding result for the Non-Statutory Class members, especially given the risks associated with their claims as discussed below.  Id.

Third, the Settlement provides that TMCC will automatically issue GAP Refunds after an Early Payoff in all U.S. States for a minimum of four years after the Settlement's Effective Date, so long as the Early Payoff occurred more than thirty (30) days before the Finance Agreement's maturity date.  Settlement, ¶ 102.  In other words, Plaintiffs substantially obtained the injunctive relief they were seeking in this case, although there is no guarantee that TMCC will continue this practice after the four-year period.  Frank Decl., ¶ 34.  Based on TMCC records, Plaintiffs' expert conservatively estimates that TMCC will pay at least **$275.85 million** in refunds during this four-year period that TMCC was not paying prior to the filing of this lawsuit.  Baggett Decl., ¶¶ 15, 34-36.  This estimate assumes no growth in GAP Refunds, even though the previous years of data produced by TMCC (January 2016 through October 2021) showed significant growth each year since 2018, and no material decrease in the prior years.  Id., ¶ 32.  Because a percentage

---

[9] This was a very high claims-rate compared to other consumer class actions where the claims rates are "often in the rage of 1 to 10%, trending towards the lower ends."  See In re Myford Touch Consumer Litigation, 2018 WL 10539266, at *1 (N.D. Cal. June 14, 2018) (conducting survey of consumer class action settlements).

of the Class will be "Repeat Customers," Plaintiffs' expert will be able to reasonably estimate the amount of future GAP refunds that will be paid to existing Class members under the Settlement once the class list is provided by TMCC to the Settlement Administrator. Id., ¶ 39. Plaintiffs' expert will employ the same methodology he used in Wells Fargo which was accepted by the Court as providing a reasonably reliable estimate of the amount of future GAP refunds that will be paid to existing class members due to the Business Practice Change. See Herrera, Dkt. No. 209, pp. 12, 23 (finding that the total value of the Settlement should include the future refunds that Plaintiffs' expert estimated based on a 5.63% "Repeat Customer Return Rate" experienced by Wells Fargo).[10]

In sum, the benefits of this Settlement strongly favor preliminary approval. This is especially the case when considering the other factors listed in Rule 23(e)(2)(C) below.

### 1.   Costs, Risks and Delay of Trial and Appeal.

"A central concern when evaluating a proposed class action settlement ... relate[s] to the cost and risk involved in pursuing a litigated outcome." Herrera, 2021 WL 3932257, at *10. "'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." Nat'l Rural Telecom. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004).

First, with respect to the Statutory Class, while Plaintiffs believe the Automatic Refund Requirements require TMCC to directly issue the refunds, Plaintiffs recognize the interpretation of these laws will, in most instances, present an issue of first impression and there is no guarantee Plaintiffs' view will prevail. Frank Decl., ¶ 37(a).

Second, with respect to the Non-Statutory Class, Plaintiffs believe they have a strong case but recognize there are serious challenges to these claims, including: (a) the Non-Statutory Class members are unable to rely on Automatic Refund Requirements as a basis

---

[10] Plaintiffs anticipate the "Repeat Customer Return Rate" for TMCC will be significantly higher than Wells Fargo due to the brand loyalty of Toyota customers. Frank Decl., ¶ 35. This "Repeat Customer Return Rate" will be determined once TMCC provides the Class List to the Settlement Administrator and provided in connection with Plaintiffs Motion for Final Approval and Motion for Attorney's Fees, Costs and Service Awards. Id.

for their refunds, (b) they are subject to TMCC's defense that they did not strictly comply with the GAP Agreements' written notice requirements; and (c) they are subject to the argument that TMCC did not assume the contractual obligation to issue the refund as part of the assignment of the Finance Agreement.  Frank Decl., ¶ 37(b).

Third, a significant percentage of the Class members are subject to arbitration agreements with class action waivers.  Frank Decl., ¶ 37(c).  It would not be cost effective for these Class members to arbitrate their claims on individual basis given the fact that the relatively small amounts at issue ($349 average refund) would be dwarfed by the cost of litigation.  Id.; Baggett Decl., ¶ 32.

Fourth, while courts routinely certify breach of contract claims on a nationwide basis – especially where, as here, the Class members were subject to a uniform practice by a finance company – there is a material risk that TMCC's arguments against class certification could prevail or present a risk of decertification in the future. Frank Decl., ¶ 37(d).

Fifth, while the parties have been vigorously litigating this case, absent a Settlement, the parties would have to engage in class certification briefing, summary judgment briefing and a trial in the future.  Frank Decl., ¶ 37(e).  The parties would also have to complete fact discovery.  Id.  Consequently, this litigation would likely take at least another year before a final resolution was reached in this matter, not including the time for appeal.  Id.

In light of these risks, the proposed Settlement provides a far favorable alternative, especially when most Class members will likely receive the maximum amount of damages they could obtain at trial.  Frank Decl., ¶ 38.  Moreover, there can be little doubt that resolving the Class members' claims through a single class action is superior to a multitudinous series of individual lawsuits and arbitrations.  Id.  Indeed, the terms of the Settlement demonstrate the advantages of collective bargaining.  Id.  Accordingly, these factors strongly favor preliminary approval.

### 2. Effectiveness of Proposed Method of Relief Distribution.

The Court is also instructed to consider "the effectiveness of any proposed method

1   of distributing relief to the class, including the method of processing class-member claims."

2   Fed. R. Civ. P. 23(e)(2)(C). "A claims processing method should deter or defeat unjustified

3   claims, but the court should be alert to whether the claims process is unduly demanding."

4   <u>Herrera</u>, 2021 WL 3932257, at *10.

5        Here, the Claims Process is straightforward. Statutory Class members will not have

6   to submit a claim and will directly receive their settlement payment from TMCC by mail;

7   the payments of which will be verified by a declaration from TMCC. Settlement, ¶ 103.

8   Non-Statutory Class members will be able to easily complete and submit their Claim Form

9   online by scanning the QR Code on their Notice of Settlement or clicking on the link in the

10   Email-Notice. <u>Id.</u>, ¶¶ 123-124. Non-Statutory Class members can also request a hard-copy

11   of the Claim Form be mailed or emailed to them, or they can download and print it from

12   the Settlement Website. <u>Id.</u> The Claim Form is easy to fill out – the Non-Statutory Class

13   members just need to check three boxes verifying their eligibility for Settlement relief and

14   sign the Claim Form. <u>Id.</u> Assuming the Court grants final approval of the Settlement,

15   approved Claims to the Non-Statutory Class will be paid electronically or by mail at the

16   election of the Class member. <u>Id.</u> The Court previously found this similar Claims Process

17   was a reasonable means of distributing relief in <u>Wells Fargo</u>. <u>Herrera</u>, 2021 WL 3932257,

18   at *11.

19             **3.    Terms of the Proposed Award of Attorney's Fees.**

20        The Court is also instructed to consider the terms of any proposed award of

21   attorney's fees. Fed. R. Civ. P. 23(e)(2)(C). In considering the proposed award of

22   attorney's fees, the Court must scrutinize the Settlement for three factors that tend to show

23   collusion: "(1) when counsel receives a disproportionate distribution of the settlement;

24   (2) when the parties negotiate a 'clear sailing arrangement,' under which the defendant

25   agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the

26   agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the

27   defendant, rather than the class." <u>Herrera</u>, 2021 WL 3932257, at *11.

28

First, Plaintiffs' counsel fee request of **$19 million** is not disproportionate and is below the standard 25% benchmark employed in the Ninth Circuit.  Where, as here, a settlement creates a monetary benefit for the class, the preferred method for determining the appropriate fee award is the "percentage method."  Aichele v. City of Los Angeles, 2015 WL 5286028, at *5 (C.D. Cal. Sept. 9, 2015).  Under the percentage method, the court simply awards the attorneys a percentage of the compensation provided under the settlement using 25% as a benchmark.  In re Hyundai & Kia Fuel Economy Litig., 926 F.3d 539, 570 (9th Cir. 2019) (en banc).  The court then may raise or lower the percentage based on several factors, including the quality of the representation, the benefits obtained for the class, the complexity and novelty of the issues presented and the risk of non-payment.  Id. "Many courts and commentators have recognized that the [percentage method] is the preferred approach in class action fee requests because it more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit from increasing the size of the class fund and working in the most efficient manner."  Aichele, 2015 WL 5286028, at *5.

When determining the value of the Settlement, courts are instructed to include any attorney's fees, litigation expenses and notice and administrative costs as part of the overall benefit.  In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 953 (9th Cir. 2015).  In addition, "where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained many courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees." Staton v. Boeing Co., 327 F.3d 938, 974 (9th Cir. 1988).  In Wells Fargo, when assessing the total value of the Settlement, this Court included: (a) the refund and interest payments made to the Statutory Class; (b) the total value of the Settlement Fund, including the payments to the Non-Statutory Class, as well as the Fee and Expense Awards and Service Awards approved by the Court; (c) the total Notice and Administrative Costs; and (d) the estimated future refunds that would be paid to existing Class members.  Herrera, Dkt. No. 209, pp. 22-23.

Under the proposed Settlement, based on the current data, TMCC will be paying (i) over **19.1 million** to the Statutory Class; and (ii) **$59 million** to cover the Approved Claims to the Non-Statutory Class, the Notice and Administration Costs, and any Fee and Expense Awards and Service Awards approved by the Court. Settlement, ¶¶ 103-109. This results in a total of over **$78 million** in benefits to the Settlement Class, *before* including any of the future GAP Refunds to existing Class members that will paid pursuant to the Settlement's Business Practice Change. A Fee Award of **$19 million** represents approximately **24%** of **$78 million** (24.3%) which is already below the Ninth Circuit's 25% benchmark without even including the value of the future GAP Refunds. Id.

Even assuming the same "Repeat Customer Return Rate" as Wells Fargo (5.63%), the future GAP Refunds to existing Class members would yield an additional value of approximately **$15.5 million ($15,482,500)** for the Class, bringing the total to over **$93 million** and the fee request percentage down to **20%** of that amount. Baggett Decl., ¶ 38. As noted above, the "Repeat Customer Return Rate" for TMCC is expected to be significantly higher than Wells Fargo due to the brand loyalty of Toyota customers and will be determined prior to the Motion for Final Approval. Frank Decl., ¶ 35. As such, the money going to the Class will be even higher and the fee percentage will be lower than **20%**. Id. Furthermore, when all of the future GAP Refunds are included (**$275.85 million**), the fee request is **5.37%** of the total money (over **$353 million**) that will be paid under the Settlement. Id. In sum, no matter how the Court measures the Settlement value, Plaintiffs' fee request will always below the 25% benchmark and, thus, is not disproportionate. Id.

Second, there is no "clear-sailing provision" in this Settlement. TMCC reserves the right to oppose the fee request. Settlement, ¶ 145.

Third, there is no "kicker" or "reverter" clause that returns unawarded fees to the TMCC, rather than the Class. The Settlement Fund is non-reversionary. Settlement, ¶ 105.

Fourth, the amount of the $19 million fee request was recommended by Judge Guilford as a mediator's proposal after reviewing the evidence submitted by Plaintiffs and

1   hearing argument from the parties.  Frank Decl., ¶ 18.  This factor further demonstrates

2   that the fee request was not the product of collusion between the parties.

3      In sum, the proposed fee request is not disproportionate to the Settlement's benefits

4   nor is it the product of collusion.  This subfactor thus favors preliminary approval.  Herrera

5   2021 WL 3932257, at *11.

6                    **4.     Agreement Identification Requirement.**

7      There   are   not   any   agreements   other   than   the   Settlement   Agreement.

8   Frank Decl., ¶ 40.

9      **D.    Equitable Treatment of Class members.**

10     The final Rule 23(e)(2) factor turns on whether the proposed settlement "treats class

11  members equally relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "Matters of concern

12  could include whether the apportionment of relief among class members takes appropriate

13  account of differences among their claims, and whether the scope of the release may affect

14  class members in different ways that bear on the apportionment of relief."  Herrera, 2021

15  WL 3932257, at *12.

16     Here, the Settlement appropriately makes a distinction between Statutory Class

17  members and the Non-Statutory Class members.  Frank Decl., ¶ 37(b).  The Statutory Class

18  members have stronger claims because they can rely on Automatic Refund Requirements

19  that require creditors, like TMCC to, at a minimum, "ensure" that a GAP Refund is paid

20  after an Early Payoff.  Id.  This is why the Statutory Class members are receiving refunds

21  plus interest directly from TMCC.  Settlement, ¶ 103.  In Wells Fargo, this Court found

22  this distinction is "logical" and weighs in favor of preliminary approval.  Herrera, 2021

23  WL 3932257, at *12.  Otherwise, the Settlement and Release is the same for all Settlement

24  Class members.  Settlement, ¶ 97.

25     **E.    The Proposed Notice Plan Satisfies Rule 23.**

26     Under Rule 23(c)(2)(B), the Court must direct that the best notice practical under the

27  circumstances be provided to the class, including individual notice to all members that can

28  be identified through reasonable effort.  Fed. R. Civ. P. 23(c)(2)(B).  Notice may be made

by one of the following: U.S. mail, electronic means, or another type of appropriate means. Id.  The notice must clearly and concisely state in plain, easily understood language: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) that a class member may enter an appearance through an attorney if the member so desires; (5) that the court will exclude from the class any member who requests exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on members.  Id.

The proposed Notice of Settlement and Long Form Notice contain all of the information required by Rule 23(c)(3).  See Settlement, Exs. D, E, F.  Courts regularly approve postcard notices that refer the class member to a more detailed long form notice on a settlement website.  See, e.g., Yaron v. Intersect ENT, Inc., 2021 WL 5184290, at * 2 (N.D. Cal. Nov. 5, 2021); Baker v. SeaWorld Entertainment, Inc., 2020 WL 818893, at *3 (S.C. Cal. Feb. 19, 2020).  All potential Class members will be identified from TMCC's records and will be mailed Notice of the Settlement through U.S. mail and by electronic email (where such emails addresses are available in TMCC's records).  Settlement, ¶¶ 114-119.  The Class will have 60 days to opt out or object to the Settlement.  Id., ¶ 28.  Based on the foregoing, Rule 23(c)(2)(B)'s notice requirements are satisfied.  Herrera, 2021 WL 3932257, at *12.

## VI.   PROPOSED TIMELINES FOR NOTICE, OBJECTIONS AND FINAL APPROVAL

Pursuant to the Settlement, Plaintiffs propose the following dates and deadlines:

| Event | Date |
|---|---|
| Mailing of Class Notice / Start of Claims Period | **14 Days After Preliminary Approval or July 25, 2022, whichever is later.** |
| Deadline to File Motion for Attorneys' Fees, Costs and Service Awards | **No Later than 15 days Prior to the Deadline for Opt-Outs/Objections or September 8, 2022, which is later** |
| Deadline for Claims, Opt-Outs and Objections | **60 Days After Mailing of Class Notice (i.e., September 23, 2022)** |
| Deadline for Plaintiffs to Move for Final Approval | **21 Days Prior to Final Approval Hearing** |
| Final Approval Hearing | **October 31, 2022 at 1:30 p.m.** |

## VII.   CONCLUSION

Based on the foregoing, Plaintiffs request the Court (1) grant preliminary approval of the Settlement, (2) certify the proposed Class and Statutory Subclass for settlement purposes only, (3) appoint Atticus to serve as the Settlement Administrator, (4) appoint Plaintiffs' counsel as Class Counsel; (5) direct that notice be published to the Class pursuant to the agreed Notice Plan, and (6) set the deadlines requested above.

Dated:  June 17, 2022                    FRANK SIMS & STOLPER LLP

By:   */s/ Jason Frank*
                    JASON M. FRANK, ESQ.
                    ANDREW STOLPER, ESQ
                    SCOTT H. SIMS, ESQ.
                    *Attorneys for Plaintiffs*

41