

Hon. Andrew J. Guilford (Retired)
Judicate West
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: 714-834-1340

Special Master

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISIONS

| | |
|---|---|
| WILLIAM MARTIN and LORI MITCHELL, each individually and on behalf of all others similarly situated, | Case No.:  2:20-cv-10518 JVS (MRW) (JW Reference No. A295051-24) |
| Plaintiffs, | |
| vs. | **SPECIAL MASTER'S [PROPOSED] ORDER RE CY PRES** |
| TOYOTA MOTOR CREDIT CORPORATION, a California Corporation | |
| Defendant. | |

**SPECIAL MASTER'S [PROPOSED] ORDER RE: CY PRES**

## 1. Background

On June 17, 2022, the parties in the matter captioned above filed their Class Action Settlement and Release.  (Dkt. No. 60-1).  Paragraph 112 of the parties' settlement agreement reads as follows:

> **112. Disbursement of Unused Portions of the Settlement Fund**. The Settlement Fund is non-reversionary.  In the event there are any amounts remaining in the Net Settlement Fund after payment of all Claims, then the Parties will meet and confer on a proposal for how the remaining amounts shall be distributed, subject to the approval of the Court.  If the Parties are unable to agree on a proposal, then both sides will submit their proposals to the Honorable Andrew J. Guilford (Ret.) for consideration.

On November 15, 2022, the United States District Court for the Central District of California (Honorable James V. Selna, United States District Judge presiding), entered an Order approving the final class action settlement in this matter.  (Dkt. No. 144).

On November 16, 2022, the District Court issued its final order appointing the Special Master in the above captioned class action lawsuit.  (Dkt. Nos. 142 and 146).

On April 9, 2024, Plaintiffs submitted its cy pres proposal and supporting brief to the Special Master.  On April 29, 2024, defendant Toyota Motor Credit Corporation ("TMCC") submitted its proposal and its brief.  On May 1, 2024, Plaintiffs submitted a reply brief to TMCC's proposal.  On May 8, 2024, the Special Master held a hearing via Zoom.

## 2. Legal Standards

The cy pres doctrine "allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the 'next best' class of beneficiaries."  Nachshin v. AOL, LLC, 663 F.3d 1034, 1036 (9th Cir. 2011).  A cy pres distribution is appropriate when it bears a substantial nexus to the interests of the class members.  It must (1) address the objectives of the underlying statutes, (2) target the plaintiff class, and (3) provide reasonable certainty that class members will be benefitted.  Lane v. Facebook, Inc., 696 F.3d 811, 819-20 (9th Cir. 2012) (quoting Nachshin, 663 F.3d at 1036), cert. denied, 187 L. Ed. 2d 392 (U.S. 2013).  There must be "a driving nexus between the plaintiff class and the cy pres beneficiaries."  Dennis v. Kellogg Co., 697 F.3d 858, 865 (9th Cir. 2012) (quoting Nachshin,

663 F.3d at 1038).  Finally, a cy pres award must not benefit a group "too remote from the plaintiff class".  Id. (quoting Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1308 (9th Cir. 1990)).  The district court should therefore scrutinize whether the use of the cy pres to ensure that it benefits the class members and rejects cy pres when it is "too tenuous" to the needs of Class Members and/or does not "promote the underlying purpose of the litigation."  Mark Brulee, et al. v. DAL Global Services, LLC, et al., CV 17-6433 JVS(JCGx) July 2, 2018.  Brulee was a wage-and-hour class action where the parties proposed paying a sub-$35,000 cy pres to Goodwill Southern California for job "training, education and employment."  Id.  Judge Selna denied preliminary approval because this cy pres proposal was deficient.  "Job training does not promote the underlying purpose of the statutes that DAL Global Services allegedly violated to prevent employers from violating wage and hour regulations.  Additionally, the connection to the needs of the Class Members is too tenuous.  Therefore, the Court cannot grant preliminary approval to the Proposed Settlement."  Id.

### 3. Cy Pres

After having paid the class, the attorneys, and administrative costs, the Settlement Fund has **$7,293,952.11** remaining for cy pres distribution.  Plaintiffs submitted a proposal with two cy pres recipients: **$4,280,800 (58.69%)** for academic research into consumer vehicle finance and GAP to be conducted by Dartmouth College; and **$2,986,000 (40.93%)** for the creation and distribution of educational materials relating to vehicle finance, including GAP, to be provided by Next Generation Personal Finance ("NextGen").

In its brief, TMCC proposed giving all of the cy pres **$7,293,952.11**  (100%) to NextGen, or, in the alternative if the Special Master did not agree that the funds should all go to NextGen, giving NextGen **$5,835,161.69** (80%) and giving **$1,458,790.42** (20%) to the American Financial Services Association's Education Fund ("AFSA").

At the May 8, 2024 hearing, the Special Master thoroughly examined the issues including other recipients such as a pro bono organizations, and the significance of the large amount involved.

**SPECIAL MASTER'S ~~[PROPOSED]~~ ORDER RE: CY PRES**

For the reasons set forth in the Plaintiffs' briefs, and during the hearing, the Special Master finds both Dartmouth College and NextGen to be suitable cy pres recipients in this matter and ORDERS that the funds in the Settlement Fund, except for a reserve of $10,000 to cover any remaining costs, are to be divided between Dartmouth College and NextGen with **50%** going to Dartmouth College and **50%** going to NextGen.  The cy pres to Dartmouth College shall be used consistent with the proposal attached as **Exhibit 1** (originally submitted as Exhibit A to Plaintiffs' April 9, 2024 brief), with reasonable adjustments to take into account any differences in proposed versus actual funding.   NextGen shall use the cy pres as follows: <u>first</u>, consistent with the proposal attached as **Exhibit 2** (originally submitted as Exhibit B to Plaintiff's April 9, 2024 brief); <u>second</u>, to develop and distribute a video game focused on the vehicle purchasing and finance process as described in NextGen's supplemental proposal attached as **Exhibit 3** (originally submitted as Exhibit 2 to TMCC's April 29, 2024 brief); and <u>third</u>, other such projects as described in Exhibit 3, with reasonable adjustments to take into account any differences in proposed versus actual funding.

Within 30 days of this order, Dartmouth and NextGen shall each submit an updated proposal, consistent with the awarded funding amounts, for review by the parties. After distribution of the cy pres awards, and payment of any outstanding costs from the settlement fund, any remaining funds shall be divided between Dartmouth and NextGen in proportion to the amounts awarded in this order.

**THUS IT IS ORDERED.**

Dated:   May 15, 2024                          _____
                                               Hon. Andrew J. Guilford (Ret.)
                                               Special Master

# Exhibit 1

## Impacts of Auto Lending on Consumer Outcomes

Bruce Sacerdote (Dartmouth), Jonathan Zinman (Dartmouth), Apoorv Gupta (Dartmouth)

## EXECUTIVE SUMMARY

More than 90 percent of households in the U.S. own an automobile and rely on it for commuting to work and accessing essential products and services, (Baum, 2009; Gautier and Zenou, 2010). Credit access is critical for vehicle purchases in the U.S.: more than 80 percent of households finance the purchase of a vehicle with a loan or lease (Zabritski 2023). These transactions occur with remarkable frequency compared to the other big markets for financing consumer durables (mortgages and student loans), with many consumers financing a car purchase every few years, often through trade-ins and/or the used car market (e.g., Grunewald et al. 2023). This adds up to $265 billion per year in auto financing originations and well over $1 trillion in outstanding auto-related debt.[1]

Policymakers, regulators, and the courts have long been concerned about a lack of transparency and consumer sophistication in the market for automobile financing. Indeed, marketing tactics that distracted consumers from the all-in costs of financing were a key motivation for mandating the Annual Percentage Rate (APR) disclosure (National Commission on Consumer Finance 1972). Yet despite Truth-in-Lending and other consumer protections, automobile loan contracts remain complex, with many potential fees and add-ons such as Guaranteed Asset Protection (GAP).[2] There is ample evidence that many and perhaps most consumers tend to underestimate financing costs, including the costs of financial products sold in conjunction with a vehicle purchase. (e.g., Stango and Zinman 2011; Argyle et al 2021), despite the fact that the market has two key hallmarks of seemingly fierce competition: the presence of tens of thousands of lenders, and the availability of some competitively priced deals.

This proposal outlines a portfolio of research projects designed to shed further light on consumer decision making, financial intermediary strategy, contracts, and competition in the market for auto financing. Our primary objectives are to identify which factors are most important in producing substantial variation in contract terms and outcomes across borrowers, measure how these factors affect consumer welfare, and where warranted map out implications and considerations for policy.

With each project we will conduct a series of dissemination activities to inform researchers, practitioners, and policymakers about our findings. Dissemination will include producing working papers, professional conference presentations, media releases and accessible non-technical summaries of the work. We will host a conference at Dartmouth that brings together policymakers, researchers, and legal experts in this area. We have experience in working with the national media to highlight major findings which impact the public. (For example we have recently been featured

---

[1] https://www.newyorkfed.org/medialibrary/Interactives/householdcredit/data/pdf/HHDC_2023Q3.pdf?sc_lang=en

[2] Brown and Jansen (2023); Grunewald et al. (2023).

in *The New York Times Upshot* and *The Daily*.) We will work with communications professionals at Dartmouth and the Jameel Poverty Action Lab at MIT to publicize our findings to policy makers and researchers in the field.

One project would examine whether particular policies help reduce inefficiencies and/or inequalities in the auto-loan market. One example of such state policy is California, which recently implemented strict regulations around GAP. There are also recent and varying policy efforts to restrict or facilitate direct-to-consumer (non-dealer) car sales a la Tesla, and to populate "banking deserts."

A second project would conduct the most comprehensive analysis to-date of auto financing terms, including how and how much they vary across otherwise similar borrowers (in terms of credit score, income, etc.) purchasing identical vehicles. One key and understudied set of questions here is how much various contract terms, including financial add-ons (such as GAP), contribute to disparate outcomes across borrowers, and how this covaries with protected characteristics. Another is whether borrowers are best served by dealer-originated or third-party lenders — despite seemingly ubiquitous personal finance advice guiding consumers toward the latter, a super-majority of borrowers favor the former.

A third project would analyze how differences in borrowing costs, including aftermarket financial products such as GAP, affect downstream outcomes for various parties. Key outcomes include default on auto and other loans, court involvement (via e.g., collections or bankruptcy), and borrower income. These outcomes have efficiency as well distributional implications; e.g., increased default on other loans would indicate that (certain) auto financing transactions impose negative externalities on other lenders, and increased court involvement or decreased income imposes costs on taxpayers.

A fourth project would examine the (in)efficacy of borrower learning over time. Borrowers have many opportunities to learn about how much they should and do end up paying for cars and financing, including from the many sources of market information available on the Internet and from experience. This begs the question of whether consumers do actually obtain better deals over time, and if so how (e.g., which terms improve)? Do they switch originators, lenders, and/or contract types (e.g., from lease to loan)? Do they purchase financial products such as GAP on a repeat basis regardless of whether they "use" the product?

Guided by the findings of the above projects, additional projects would develop and test interventions designed to help consumers obtain good deals. One likely focus is to promote awareness and wariness of potentially shrouded or add-on costs like documentation fees and GAP. Another would target current borrowers holding GAPand/or extended warranties with information about the benefits (and costs) of canceling such policies as their vehicle's value depreciates. A third potential focus is the financing process and source; e.g., if the conventional wisdom that consumers are better off lining up financing from a third-party before negotiating purchase price with the dealer proves to be correct in our first proposed project, then we would test interventions nudging prospective borrowers in that direction.

2

Our proposed work requires funding for four key inputs: large datasets, research support personnel, researcher time, and dissemination. We will need to purchase or create (through primary data collection) several large datasets – on financing terms, car sales, consumer credit reports, state and local policies, lender presence, and activity – and work with vendors to combine them in ways that protect any personal identifying information. Research support personnel will assist with data procurement, collection, management, cleaning, and analysis under our direction. They will also provide project management on work that requires the development and implementation of interventions designed to improve consumer decision-making.

Our time is constrained by pre-existing research, teaching, and service commitments; accordingly, we have budgeted to free up the time required for this new proposed work through teaching reductions and earmarked summer months. Dissemination expertise likely will be provided in-kind, based on our affiliations with Dartmouth and J-PAL, with expenses dedicated to conference travel and conference/event/visitor hosting.

In summary, our proposed projects will address a range of key questions in the U.S. auto lending market.  We will examine the current state of the market in terms of variance of interest rates, non-salient fees, and the cost of financial and other add-on products (like GAP) holding the car choice fixed.  We will also examine the degree to which costs of financing vary with borrower characteristics.  These descriptive statistics may have implications on consumer access and pricing in the market for auto-lending.  Next, we will examine the impacts of lending characteristics and competition on pricing and borrowers' financial well-being.  We will then ask how state-level policies on interest rate caps (usury laws), disclosure, limits on wage garnishment, and limits on GAP, impact consumer lending outcomes.  Finally, we will test the impacts of information-based interventions designed to inform consumers about GAP and their rights to cancel GAP and receive refunds for unused portions of premia.

## Dissemination Activities

We will take a multipronged approach to dissemination and publication.  First, each paper will be presented multiple times at professional conferences around the U.S.  Some of these presentations will be at conferences of the National Bureau of Economic Research (NBER), the American Economics Association, and the Association for Policy Analysis and Management.  We will also be presenting the work at professional seminars at the various Federal Reserve Banks and top universities around the country. The Federal Trade Commission (FTC) and Consumer Financial Protection Bureau (CFPB) are also likely to be interested, and Zinman has presented at those agencies many times, including a keynote address at an FTC research conference. Internally at Dartmouth, we have a well-attended workshop on Consumer and Household Finance that is co-organized by Zinman, which includes faculty and students from across Dartmouth, including the Tuck School of Business.  This will give us further opportunities for feedback and to advertise our work.

Second, we will produce a series of working papers which we will make available through Dartmouth's webpages, the National Bureau of Economic Research, and the Social Science Research Network (SSRN).  These working papers tend to be widely read and receive media

coverage.  Many of the working papers will be submitted to top general interest and field journals for publication.

Third, we will produce non-technical summaries of the papers and make these available to policymakers and the general public.  In particular, the Jameel Poverty Action Lab at MIT is particularly skilled at summarizing the key results from randomized control trials and getting these into the hands of the relevant policymakers.  JPAL's State and Local Innovation Initiative, co-chaired by Prof. Sacerdote, is a network of state and local policymakers and researchers who focus on evaluating relevant state and local policies and scaling up the most effective policies.

Fourth, we will host an event that brings together academics, practitioners from various sides of the market (retail, finance, law), regulators, and policymakers.

## PROPOSAL

### Summary

Our six projects are designed to deepen our understanding of the auto lending market and its impact on consumers.  In the first four projects we will use large micro dataset to examine questions of variation in lending terms and costs, how these vary by geography and consumer demographics, and how this may contribute to differing outcomes for consumers.  We study the impact of competition from other dealers and local banks on prices paid by consumers.  We also examine how macroeconomic shocks are transmitted to consumers via the availability and pricing of auto financing.  Furthermore, we also ask about the impacts of state-level policies designed to aid and inform borrowers.  Finally, we propose two experiments that will inform a set of borrowers about the costs and benefits of GAP and their right to cancel.  In one experiment we analyze whether additional information about GAP alters the number of consumers who purchase GAP. In the second experiment, we inform existing holders of GAP of their right to cancel and the amount they could potentially receive through a refund. We then ask whether people are more likely to cancel given the additional information and whether this change in behavior is related to the size of the refund and the usefulness of the policy they are canceling.

To do the proposed project, we would need to acquire four major datasets for these projects. While each dataset has consumer-level data on auto loans, some dataset also provide detailed loan terms, specificity of the car purchased from a particular car dealer, and details on the geographic location and demographics of the borrower.  The first major dataset is a representative sample of two million households from Equifax credit reporting.  These data include credit score, age, balances with all lenders (including auto lenders), payment histories with all lenders, and geographic location.   From these data, we can infer the size of loans taken out and likely also the interest rate based on the loan payments data and changes in balance over time. This data will allow us to study the impact on consumer financial well-being.  The second dataset is a census of 260,000 loans from a large automotive finance company.  These data are particularly rich in that they contain the exact dealer, which car was purchased, and loan details including interest rates, fees, use and amounts of GAP, automobile service contracts, and life insurance.

4

The third dataset contains loan-level data from Asset Back Securities (ABS). These data include borrower credit score, cosigner, income and employment verification; loan term, balance, coupon, age and subvention; vehicle make, model, model year, and condition when bought (new or used); and the full performance history of the loan. The fourth dataset is a large sample of detailed loan data at the time that lenders purchased the data from dealers. The data come from a major lending platform used by thousands of dealers to market possible loans to auto financing firms around the country. These data will include data on car purchased, price paid, interest rate, fees, and other loan terms, plus add-ons such as GAP and extended warranties.

### What Are the Drivers of Dispersion in Loan Terms and Costs?

As described above, the auto lending market is (i) large in size and scope and (ii) critical to enabling families to purchase automobiles. Given the economic importance of the market, a primary research question is whether access to loans and the contract terms offered are fair and competitive. Researchers and policymakers are naturally interested in knowing whether (i) the risk-adjusted costs of borrowing vary systematically by demographic characteristics, and (ii) what factors drive the dispersion in auto-loan costs across lenders and borrowers.

Our micro dataset will allow us to better understand the dynamics of the US auto loan market and to map the variation in existing outcomes. The first goal is to understand the components of the total cost of auto loans. Do interest rates and APR capture the bulk of the cost of borrowing? Or are non-salient fees, origination fees, GAP, and warranty coverage a significant part of the borrowing total cost? Next, we analyze how much the fees vary across dealers and lenders. Do borrowers in lower-income or less financially educated areas end up paying more in fees? If so, then which fees and add-ons are more prevalent in those areas?

We will start by documenting areas with high versus low-cost counties or zip codes using heat maps. We will also map where the variance in price paid by consumers is highest.

#### *What market conditions lead to relatively low and relatively uniform total costs?*

The effect of competition on auto-lending costs is unclear. Broadly speaking, we do expect that competition drives down costs for consumers. However, when consumers are unaware, dealers could actively shroud prices when faced with greater competition. Another potential issue when measuring the effect of competition on outcomes is how competition should be defined in this market. Does the presence of local third-party bank lenders lower prices and fees for everyone? Does a dealer's use of an online lending platform raise or lower the prices paid by consumers? Does competition come in the form of having multiple dealers of the same car manufacturer nearby? Or is competition across manufacturers important? If lending is a national market, do local conditions not influence pricing? Answers to such questions are even more relevant given two recent trends in auto-lending: (i) ban by multiple states on direct-to-consumer sales; and (ii) increase in online lending platforms leading to the prevalence of local "banking deserts". In answering these questions, we will also analyze the effects of bundling car sales, finance, and

5

trade-in services all in the same transaction. Does the dealer's reliance on a captive financing source improve or worsen consumer outcomes?

We see great value in exploring these questions descriptively (at least initially) using ordinary least squares regressions. For example, we will regress measures of total financing costs on indicators for deciles of zip code income, number of dealers per capita, and presence of a competing dealer with the same car make (all key variables of interest), while controlling flexibly for borrower credit scores, buyer, age, loan to value and value of the car purchased. We will also run regressions to predict the size and presence of loan fees or the use of GAP.

### *How do aggregate market conditions affect the total cost of borrowing?*

Given the economic importance of auto-lending for US households, we aim to provide evidence of how large aggregate adverse events of the past decade affected this market. As the vertical integration of financing and manufacturing arms for captive financing, lending arms are particularly susceptible to negative costs or demand shocks to upstream manufacturers. Because captive financing captures 80% of the overall lending in the auto-loan market, this generated the possibility of pass-through of large negative aggregate shocks to household credit outcomes. To study this question, we consider five important episodes faced by auto-manufactures over the last decade: (i) the 2008 Financial Crisis; (ii) the 2018 metal import tariffs; (iii) changes to EPA car emissions; (iv) auto-workers strikes; (iv) fiscal stimulus following the COVID-19 outbreak. We then study how these negative shocks to auto manufacturing costs affected the downstream lending outcomes for captive lenders.

For each of these events, we will use the detailed dataset on auto-lending to understand how each of these events affected the interest rates and non-salient fees that were offered to the borrowers. Specifically, we will compare the changes to loan contracts and auto credit before and after the changes, and across captive versus non-captive lenders. We will use county-level IRS data to determine the number of households that were eligible to receive the stimulus checks, allowing us to compare the effects across high and low-impacted areas.

## Using Randomized Control Trials (RCT) to Reduce Informational Frictions in the Market for GAP

Recent analysis suggests that consumers are not fully informed about the benefits and costs across many loan products. Auto-loans are no expectation: consumers are seldom aware of GAP, and its associated costs and benefits. Consumers appear to forget that they have GAP — they rarely cancel the policy even when the loan to value has improved in their favor and there is no longer a positive gap between loan value and potential payout in the event of total loss. Finally, consumers frequently fail to ask for a refund on unused GAP premiums after their loan is paid off, or when they sell their vehicle in the middle of loan tenure, or after GAP is canceled.

We propose two randomized control trials (RCT) to ask whether we can change consumer behavior through low-cost interventions providing consumers with information. In each case, we will randomize consumers into receiving either the informational nudge or business as usual. In all

cases, we will work with multiple large national auto lenders to test how their borrowers respond to the provision of additional information through a credible source (their lender). We will recruit the lenders by using our micro data on auto loans to locate a set of lenders that are both national in scale and who offer the most consumer-friendly terms. We will then contact research departments at the lenders and encourage them to participate in our study. The benefits for the lenders include goodwill with their customers and the chance to participate in a national study designed to reduce inequality in borrowing costs. Lenders can choose whether or not they want to be explicitly named in this pro-consumer study.

In the first intervention, we will provide potential car borrowers with additional facts about GAP at the time of purchase. The lender will send two separate identical emails (several days apart) making explicit the total likely cost of the GAP and how much the estimated gap between the loan amount and the total loss payout would be. We will provide a graphic showing at what point in the life of the loan the GAP would no longer be valuable, ensuring that the information is easy to digest. Finally, we will give the consumer details on their right to cancel and right to receive a refund of unused premia paid.

The key outcomes in this study will be whether the consumer decides to purchase GAP and whether the consumer cancels GAP within three years of car purchase (and when in the life of the loan the cancellation occurs). We would expect the impacts of our intervention to vary by borrower income and education, but also by the loan to value of the car. Buyers who are putting down a significant amount of the value of the car are less likely to benefit from GAP.

In our second intervention, we will target consumers who are in the process of buying a new car but who also have an outstanding loan and GAP on their old loan. We will remind customers that their GAP on the old loan will be canceled but we will also remind them that they have the right to receive a refund on unused premia. We will experiment with how we present the size of the refund due and the degree to which we make the process for obtaining a refund a "one-click" experience. Our key outcome is whether or not consumers request a refund.

The lenders' data also puts them in a unique position to identify borrowers who have GAP but are no longer benefiting from it because the value of the car now exceeds the value of the loan. Our intervention will also add a sample of borrowers who initially took out a loan and GAP 2-3 years prior (whether or not they are purchasing a new car). The treatment group will receive two emails explaining that the GAP no longer appears to be valuable and alerting the consumer that they have the right to cancel and how to cancel. We will also alert the consumer that they have a right to receive a refund on any unused premia. Within the treatment group, we may also send physical mailings or even FedEx mailings to truly grab the customer's attention. We may also experiment with making the cancellation process easy for some customers by providing a one-click link that quickly guides them through the cancellation process. We may also experiment with how we frame or highlight the possible total money saved.

These experiments will lead to significant gains in our understanding of how consumers behave in markets for these complex financial products. As an eventual outcome of the study: suppose we discover that informational nudges are valuable at the stages of car buying, car loan payoff, or

once the consumer no longer needs GAP. This will suggest that consumer welfare could be improved either through changes in firm practices or through regulations requiring lenders to push this information out to consumers.

**Conclusion**

Overall, we believe that the research and dissemination activities proposed in this proposal will provide comprehensive new findings and insights into automotive consumer finance, which will help inform policymakers and the general public in ways that will reduce practices that contribute to detrimental effects on consumers. Altogether, the projects proposed will not only spur a new body of knowledge specific to the questions posed in this research, but will also contribute to advancing the more general field of consumer finance, especially as related to automotive lending. The proposed work will have a profound impact both locally and nationally, will benefit consumers, and has the potential to positively affect the practices employed by dealers as well as the choices made by consumers. We are grateful for this opportunity to present these ideas, and we look forward to providing information about any questions or suggestions that you may have. Thank you for your interest and time!

8

# References

**Adams, William, Liran Einav, and Jonathan Levin (2009).** "Liquidity constraints and imperfect information in subprime lending." *American Economic Review* 99, no. 1: 49-84..

**Argyle, Bronson, Taylor Nadauld, and Christopher Palmer (2023).** "Real effects of search frictions in consumer credit markets." *The Review of Financial Studies* 36, no. 7: 2685-2720.

**Argyle, Bronson, Taylor Nadauld, Christopher Palmer, and Ryan Pratt (2021).** "The capitalization of consumer financing into durable goods prices." *The Journal of Finance* 76, no. 1: 169-210.

**Argyle, Bronson S., Taylor D. Nadauld, and Christopher J. Palmer (2020).** "Monthly payment targeting and the demand for maturity." *The Review of Financial Studies* 33, no. 11: 5416-5462.

**Baum, Charles L. (2009)** "The effects of vehicle ownership on employment." *Journal of Urban Economics* 66, no. 3: 151-163.

**Benmelech, Efraim, Ralf R. Meisenzahl, and Rodney Ramcharan (2017).** "The real effects of liquidity during the financial crisis: Evidence from automobiles." *The Quarterly Journal of Economics* 132, no. 1: 317-365.

**Brown, Jennifer, and Mark Jansen (2023).** "The Intended and Unintended Consequences of Consumer Protection Laws: An Analysis of Wage Garnishment and Usury Limits in Auto Lending." Working paper, SSRN.

**Busse, Meghan R., Devin G. Pope, Jaren C. Pope, and Jorge Silva-Risso (2015).** "The psychological effect of weather on car purchases." *The Quarterly Journal of Economics* 130, no. 1: 371-414.

**Einav, Liran, Mark Jenkins, and Jonathan Levin (2013).** "The impact of credit scoring on consumer lending." *The RAND Journal of Economics* 44, no. 2: 249-274.

**Einav, Liran, Mark Jenkins, and Jonathan Levin (2012).** "Contract pricing in consumer credit markets." *Econometrica* 80, no. 4: 1387-1432.

**Gautier, Pieter A., and Yves Zenou (2010).** "Car ownership and the labor market of ethnic minorities." *Journal of Urban Economics* 67, no. 3: 392-403.

**Grunewald, Andreas, Jonathan A. Lanning, David C. Low, and Tobias Salz (2023).** "Auto dealer loan intermediation: Consumer behavior and competitive effects". Working paper.

9

**Gurun, Umit G., Gregor Matvos, and Amit Seru (2016).** "Advertising expensive mortgages." *The Journal of Finance* 71, no. 5: 2371-2416.

**Jansen, Mark, Samuel Kruger, and Gonzalo Maturana (2023).** "Dealer financing in the subprime auto market: Markups and implicit subsidies." Working paper, American Finance Association Annual Meeting.

**Jansen, Mark, Lamar Pierce, Jason Snyder, and Hieu Nguyen (2023).** "Product Sales Incentive Spillovers to the Lending Market: Evidence From Subprime Auto Loan Defaults." *Management Science*.

**Jiang, Zhenling, Yanhao "Max Wei, Tat Chan, and Naser Hamdi (2023).** "Designing dealer compensation in the auto-loan market: Implications from a policy change." *Marketing Science* 42, no. 5: 958-983.

**Lacetera, Nicola, Devin G. Pope, and Justin R. Sydnor (2012).** "Heuristic thinking and limited attention in the car market." *American Economic Review* 102, no. 5: 2206-2236.

**Mian, Atif, and Amir Sufi (2012).** "The effects of fiscal stimulus: Evidence from the 2009 cash for clunkers program." *The Quarterly Journal of Economics* 127, no. 3: 1107-1142

**Momeni, Morteza (2023).** "Competition and Shrouded Attributes: Evidence from the Indirect Auto Loan Market." Working paper.

**National Commission on Consumer Finance (1972).** *Consumer Credit in the United States*. Washington, D.C.: U.S. Government Printing Office.

**Stango, Victor, and Jonathan Zinman (2011).** "Fuzzy math, disclosure regulation, and market outcomes: Evidence from truth-in-lending reform." *The Review of Financial Studies* 24, no. 2: 506-534.

**Zabritski, Melinda (2023).** "State of the automotive finance market. Third Quarter 2023." Experian.

**Research Team Bios**

**Dr. Bruce Sacerdote** is the Richard S Braddock 1963 Professor of Economics at Dartmouth College.  He teaches finance and behavioral finance at the College.  He is a member of the National Bureau of Economic Research and the author of numerous labor economics, macroeconomics, finance, and economics of education papers.  Particularly relevant for this study, Sacerdote is a Co-Chair of the JPAL/MIT State and Local Innovation Initiative which designs and funds Randomized Control Trials (RCTs) to measure the impacts of state and local policies on welfare and outcomes.  His work has been quoted in the New York Times, Wall Street Journal, the Economist, and other major media outlets.

**Dr. Jonathan Zinman** is the R. Stephen Cheheyl Professor of Economics at Dartmouth College, where he has served on the faculty since 2005. He teaches finance and is currently developing the College's first course dedicated to behavioral economics. Prof. Zinman is a member of the National Bureau of Economic Research and has advised various policymakers across the U.S. and world, including serving on the inaugural Consumer Advisory Board to the CFPB. He is an innovator in promoting work at the intersection of research, practice, and policy, e.g., by helping lead the development of the Financial Inclusion Research program at Innovations for Poverty Action. His research focuses on consumer finance, behavioral economics, and field research methods and has been published in top journals in economics, finance, management, and general-interest science. This work includes dozens of influential papers on pricing, advertising, and access in consumer credit markets, including papers focused on limited enforcement of TILA in the auto loan market, penalty fee pricing in credit contracts, risk-based pricing, and how loan marketing content influences consumer decisions.

**Dr. Apoorv Gupta** is an Assistant Professor of Economics at Dartmouth College where he teaches financial economics. He has written and published work in the field of finance using large-scale datasets spanning multiple areas of finance including auto-lending, household finance, and informational frictions in credit uptake for small firms. More recently, he has been involved in the rollout of high-stake field experiments with auto lenders to design optimal loan modifications for distressed auto borrowers. The learning from the RCTs will provide large-scale evidence on sources of financial distress in the auto-loan market.  His work has been quoted in CNBC, World Bank, and many other media and policy outlets across the US, UK, and India.

## ESTIMATED PROJECT COSTS - FOUR-YEAR PROJECT PERIOD

***Data Costs***
| | |
|---|---|
| Equifax | $750,000 |
| Proprietary Lender Platform Data | $400,000 |

***Randomized Control Trial Implementations***
*Dealer Level Interventions*
| | |
|---|---|
| Outreach to Dealers to recruit them to participate in the intervention | $160,000 |
| Fidelity of Implemention with Dealer intervention | $45,000 |

*Consumer Level Interventions*
| | |
|---|---|
| Advertising/Outreach for recruitment for consumer participants | $300,000 |
| Consumer Incentives to participate in study and complete surveys | $300,000 |
| Credit Reports for consumer in study | $225,000 |

***Personnel Costs***
| | |
|---|---|
| Faculty Research Time | $842,000 |
| Undergraduate Research Assistants (part-time) | $124,800 |
| Predoctoral Researchers (full-time) | $624,000 |
| Post Doctoral Researcher (full-time) | $390,000 |

***Travel/Dissemination***
| | |
|---|---|
| Seminar/conference and research travel | $20,000 |
| Dartmouth Based Policy and Research Conference | $80,000 |
| Travel Costs for Visiting Scholars and Experts on Topic | $20,000 |

**TOTAL PROJECT COSTS**      **$4,280,800**

Principal Investigators: Bruce Sacerdote (Dartmouth), Jonathan Zinman (Dartmouth), Apoorv Gupta (Dartmouth) - *January 2024*

| *Data Costs* | *Notes/background* |
|---|---|
| Equifax | 1,000,000 records of customers; representative sample weighted to people with auto loans |
| Proprietary Lender Platform Data | Data from auto lending platform to obtain detailed data on interest rate, fees, car cost, GAP insurance, borrower demographics and zip code (approx. $100K/year x four years) |

| *Randomized Control Trials and Primary Data Collection* | |
|---|---|
| *Dealer Level Interventions* | |
| Outreach to Dealers to recruit them to participate in the intervention | Additional RA time, social media ads, and/or other outreach ($100 x 800 dealers x two years) |
| Fidelity of Implementation with Dealer intervention | $75/dealer in study x 300/year x two years |
| *Consumer Level Interventions* | |
| Advertising/Outreach for recruitment for consumer participants | Social media, phone, or other outreach ($100/consumer recruited into study x 1500 consumers for two years) |
| Consumer Incentives to participate in study and complete surveys | Incentives for participants to complete surveys  ($100/consumer recruited into study x 1500 consumers for two years) |
| Credit Reports for consumer in study | Credit reports  ($75/report x 1500 consumers for two years) |

| *Personnel Costs* | |
|---|---|
| Faculty Research Time | 2 mo. each for three lead project faculty throughout the project |
| Undergraduate Research Assistants (part-time) | 4 part-time undergraduate RA's annually for 3 terms/year throughout the project |
| Predoctoral Researchers (full-time) | 2 predocs/year to working on data cleaning, assembly and analysis throughout project |
| Post Doctoral Researcher (full-time) | 1 postdoc/year for research, project support, analysis, publication writing throughout project |

| *Travel/Dissemination* | |
|---|---|
| Seminar/conference and research travel | Approx. 3 trips/year x 2 years for faculty to travel to National Bureau of Economic Research and to academic seminars/conferences to present the work and disseminate the research findings<br><br>Dartmouth conference which brings together researchers, policy makers, and law professionals to share findings and discuss policy approaches and best practices. |

|  | Travel budget for visiting scholars (to Dartmouth) who work on these topic areas. |
|---|---|

# Exhibit 2



## VEHICLE PURCHASING AND FINANCING PROPOSAL

### Next Gen Personal Finance Background

Our mission is that every U.S. high school student will graduate having taken a one-semester course in personal finance by 2030.  Our program started when the co-founder volunteered to teach students in East Palo Alto, California in 2010 and saw the impact on students and their families.  Since then, Next Gen Personal Finance has grown into the leading go-to curriculum provider and advocate for high school financial literacy.

- **Distribution:** Our distribution is unparalleled as the 95,000+ teachers that use Next Gen Personal Finance (NGPF) curriculum reach 85% of high school students in all 50 states. This grant will help to expand access to financial education in several large school districts serving low-income students that traditionally have been left behind. This market will be tripling in size as the number of states requiring this course has grown from 8 to 25 in the past three years with the 17 new states in the process of implementing this new course.

- **Curriculum development:** Our curriculum has been recognized by Common Sense Education as a Top Selection for Learning. When asked if teachers would recommend the NGPF curriculum to colleagues, teachers gave NGPF a Net Promoter Score of 85, which is considered world class.

- **Professional Development**: In addition, our professional development workshops have reached more than 17,000 educators in the past few years who have invested, on average, 25 hours deepening their content knowledge and finding resources to bring back to their students.

**Next Gen Personal Finance**
330 Primrose Rd, Suite 202
Burlingame, CA 94010

ngpf.org
info@ngpf.org





| FinEd's impact on: | |
|---|---|
| Student loan repayment | [PF Ed Mandates & Student Loan Repayment](#) (2022) |
| Domestic violence prevention | [Can Financial Literacy Reduce Domestic Violence?](#) (2022) |
| **Financial knowledge and behaviors** | **[Financial Ed Matters: Testing Effectiveness of FinEd Across 76 RCTs](#) (2021)** |
| Likelihood & frequency of payday borrowing | [Does State-Mandated Financial Education Affect High-Cost Borrowing?](#) (2019) |
| Credit behaviors | [The Effects of K-12 FinEd Mandates on Postsecondary Ed Outcomes](#) (2018) |
| Financial knowledge and behaviors | [Does Financial Ed Impact Financial Literacy and Behavior, and if so, when?](#) (2017) |
| Retirement Savings | [Retirement Savings with School-Based FinEd](#) (2016) |
| Wealth gaps & inequality | [Optimal Financial Knowledge & Wealth Inequality](#) (2013) |
| Parents' financial behaviors ("trickle up") | [The impact of high school FinEd: experimental evidence from Brazil](#) (2013) |

**Significance of the Vehicle Purchasing Process to Building Financial Literacy**

Understanding the financial intricacies of purchasing a car can offer invaluable lessons in financial literacy, equipping individuals with practical skills and knowledge for managing their





---

finances effectively. Here are eight key examples that illustrate the deep connection between car buying and various aspects of financial literacy:

- **Credit Scores and Financing**: A higher credit score can secure lower interest rates on car loans, demonstrating the value of good credit management.
- **Sales Tactics and Psychology**: Recognizing sales tactics helps buyers stay focused on their needs and budget, enhancing critical thinking in financial decisions and understanding the incentives of the person "across the table" from you.
- **Budgeting and Total Cost of Ownership**: Understanding the full cost of owning a car, including maintenance, insurance, and fuel, underscores the importance of comprehensive budgeting.
- **Auto Insurance and Risk Management**: Choosing the right insurance coverage teaches risk management by protecting against potential financial losses.
- **Depreciation and Asset Management**: Learning about car depreciation highlights the importance of considering assets' long-term value in financial planning.
- **Understanding Fees and Extras:** Car purchases can come with a variety of additional fees (e.g., documentation fees, registration, taxes) and optional add-ons or warranties. Being able to dissect these costs and make informed decisions about what is necessary versus optional hones critical thinking and decision-making skills.
- **Savings and Planning**: Saving for a down payment introduces goal-setting and planning, essential skills for future financial stability.
- **Negotiation Skills**: The car buying process often involves negotiation, not just on the price of the vehicle but also on the terms of financing and the value of any trade-in. Developing negotiation skills can be a valuable aspect of financial literacy, applicable in many other financial transactions.






**NGPF**
**NEXT GEN PERSONAL FINANCE**

---

**<u>Proposal</u>**

The proposed grant money will be used in two interrelated ways.

First, we will create a stand-alone vehicle purchasing and financing module that teachers can access on their own schedules as part of the NGPF On-Demand library.  This module will provide a step-by-step tutorial on the car buying process.  It will walk through the pros and cons of every aspect of an automotive purchase: e.g. new vs. used; purchase vs. finance or leasing; trade-ins; aftermarket financial products such as GAP or credit life insurance; aftermarket insurance products; extended warranties; negotiation strategy; whether owning a car makes sense; and the ongoing costs of ownership (parking, insurance, fuel, maintenance, depreciation).  Our goal is to make sure that every student who takes the course fully understands the economics of acquiring a vehicle and can make informed rational, as opposed to emotional, decisions.  For many high-school students, buying a car is one of the first major financial decisions they will make.  And we want them to make smart ones.

Second, we will use the grant money to support our efforts to expand financial literacy education (now including vehicle purchasing) across the country.  These funds will be used to expand access to high quality financial education in large school districts, increase NGPF's capacity to train more teachers given the tripling in size of the financial education market, and develop new curricular resources for the car buying process.

Key elements of the attached budget include:

- **Create curricula focused on vehicle purchasing and financing for both teachers and students**

  - Build a standalone module as described in the proposal above that teachers can access on their own schedules as part of the <u>NGPF On-Demand library</u>**.**

  - Create a student lesson that provides a thorough guide for students on the car buying process, covering critical choices like new vs. used, buying vs. leasing, and including topics such as aftermarket financial products such as GAP or credit

**Next Gen Personal Finance**
330 Primrose Rd, Suite 202
Burlingame, CA 94010

ngpf.org
info@ngpf.org





**NEXT GEN PERSONAL FINANCE**

life insurance; aftermarket insurance products; warranties, and ongoing ownership costs.

- ○ Create a FinCap Friday on aspects of the car buying process, including GAP or credit life insurance. NGPF's FinCap Friday is a current event explainer video + quiz game that reaches more than a million students annually,

- ○ All of these resources will be updated annually to reflect ongoing changes in the car buying process

- **Deliver 15-25 one-day in-person workshops called FinCamps for teachers throughout the United States that will include the vehicle purchasing module**

  - ○ **Goals**: Build teacher content knowledge, provide educators with curriculum resources they can use immediately (at no cost) and build community of practice among teachers new to teaching personal finance.
  - ○ **Cost:** Average cost of $13,500 per event assuming 50 attendees
  - ○ **Reach**: 750-1250 teachers reached annually with each teacher reaching 100 students for total reach of 75,000 - 125,000 students annually
  - ○ **Content:** Consumer Skills will be incorporated into the workshop.

- **A three year, $390,000 grant to the Fresno Unified School district, the #3 largest district in California serving more than 73,000 students consisting of 90% minority population with 65% economically disadvantaged.** The personal finance specialist hired through this grant will support educators in the district by developing a model curriculum and also providing professional development workshops that include the vehicle purchasing module. The goal of the grant will be to have an elective course in personal finance offered in each of the 16 high schools. None of the high schools offer this course today. The importance of this pilot program is that it will serve as a model in building out elective courses across a large district.

- **Expand the NGPF team delivering professional development to teachers**
  - ○ One professional development specialist hire in 2024 and one additional hire in 2026

**Next Gen Personal Finance**
330 Primrose Rd, Suite 202
Burlingame, CA 94010

ngpf.org
info@ngpf.org





- - Salary of $90,000 + 30% benefits = $117,000 per hire
  - Professional development specialists take on multiple roles at NGPF including FinCamp facilitator, On-Demand module creator and Certification Course teacher.
  - These two hires will enable us to double the number of teachers reached through our professional development work and will be managed by the Director of Professional Development

- **Expand the NGPF team implementing new Personal Finance course requirements in 17+ states**
  - One implementation specialist hire in 2024 and one additional hire in 2025
  - Salary of $90,000 + 30% benefits = $117,000 per hire
  - Implementation specialists work with state Departments Of Education and large districts to provide curriculum support, crosswalks that align curriculum to their standards and professional development plans to increase teacher readiness
  - Each specialist will take responsibility for the successful implementation in 8-9 states and will have the support of a Chief Implementation Officer.





| Next Gen Personal Finance Proposal Budget | | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| | | | | | |
| | | **2024** | **2025** | **2026** | **2027** |
| **Expand access to Financial Education in large, diverse school district** | | | | | |
| **Grant program to support Fresno Unified School District to hire a personal finance specialist over a 3 year period.** | | **$130,000** | **$130,000** | **$130,000** | |
| **Goal: All 16 schools in the district offer an elective course in personal finance** | | | | | |
| **Impact: 73,000 students in the third largest school district in California; 90% minority student population and 65% economically disadvantaged** | | | | | |
| | | | | | |
| **Deliver in-person professional development workshops ("FinCamps") across United States** | | | | | |
| Number of FinCamps | | 15 | 20 | 20 | 25 |
| Cost per event (from FinCamp Budget) | | $11,500 | $11,500 | $11,500 | $11,500 |
| **TOTAL FinCamp Cost** | | **$172,500** | **$230,000** | **$230,000** | **$287,500** |
| | | | | | |
| **Increase NGPF capacity to provide professional development** | | | | | |
| Professional Development Specialists | | 1 | 1 | 2 | 2 |
| Cost per hire @$90k salary + 30% benefits = $117,000 | | $117,000 | $117,000 | $117,000 | $117,000 |
| **TOTAL PD Cost** | | **$117,000** | **$117,000** | **$234,000** | **$234,000** |
| | | | | | |
| **Increase NGPF capacity to implement new personal finance requirements by supporting state Education Depts. and large districts** | | | | | |
| Implementation Specialists | | 1 | 2 | 2 | 2 |
| Cost per hire @$90k salary + 30% benefits = $117,000 | | $117,000 | $117,000 | $117,000 | $117,000 |
| **TOTAL Implementation Cost** | | **$117,000** | **$234,000** | **$234,000** | **$234,000** |
| | | | | | |
| **Create curricula focused on vehicle purchasing and financing for both teachers and students** | | **$50,000** | **$35,000** | **$35,000** | **$35,000** |
| Includes on-demand module for teachers, a comprehensive lesson for students, a FinCap Friday. | | | | | |
| All of this curricula will be updated annually to reflect changes in car buying process | | | | | |
| | | | | | |
| **TOTAL Cost** | | **$586,500** | **$746,000** | **$863,000** | **$790,500** |

# Exhibit 3



---

**Background on Next Gen Personal Finance (NGPF):** The Center for Financial Capability, the precursor organization to Next Gen Personal Finance (NGPF), was founded in May 2014 by Jessica Endlich and Tim Ranzetta. Incorporated in 2017 as a private operating foundation with the same co-founders, NGPF today provides more than 100,000 personal finance educators in all 50 states with curriculum (three high school courses, one middle school and one financial algebra) and professional development workshops. The 16 person team includes curriculum, professional development, web design and development, finance/accounting, and project management professionals. The average tenure of current team members is more than 4 years. As President, Jessica Endlich manages all the operational aspects of the organization while Tim Ranzetta focuses on external relationships, including partnerships, media and advocacy work done through an affiliated organization, NGPF Mission 2030 Fund.

NGPF has been self-funded for the  first decade by the co-founder, Tim Ranzetta. An endowment has been created by Mr. Ranzetta and will continue to fund the core operations of the organization moving forward. This specific grant, along with additional grants received by NGPF, will allow the organization to scale to meet the surging demand for financial education.

**Personal finance education surging in the U.S.**: 53% of high school students in America are required to take a course in personal finance today or will soon be required based on enacted legislation (NGPF 2024 State of Financial Education Report). This represents a tripling of the market size since 2020 and means the market that NGPF serves is seeing significant growth. In addition, California has a ballot measure that would require all California high schoolers to take a personal finance course that is polling at 75-80% that will be on the November ballot. This would increase the number of students required to take a personal finance course to increase to 65-66% of U.S. high school students. Given the popularity of this movement, we anticipate more states joining the 25 that currently require it.

**Impact of increased funding:** 17 states are currently in the process of implementing this new personal finance course. NGPF is the leader in personal finance education in middle and high schools across the country with more than 100,000 educators (who reach 85% of high school students) using our curriculum and being trained by our team's facilitators. NGPF will be making

**Next Gen Personal Finance**
330 Primrose Rd, Suite 202
Burlingame, CA 94010

ngpf.org
info@ngpf.org





significant investments to meet this demand and ensure that courses are taught using a quality curriculum taught by a highly qualified and confident teacher.

Having increased funding will enable NGPF to accomplish the following:

- Will sustain NGPF efforts supporting states and large districts over a longer time frame (from 4 years in original proposal to 5 years with incremental funding). Early results indicate that states will take more time to implement these courses so having sustained funding over a longer time frame ensures greater success.

- Accelerates NGPF's adoption and implementation efforts into key states and districts ensuring that more students receive this instruction on a faster timeline. With 13% of high school graduates in the U.S., California will be a key state. With a very popular measure (polling at 75-80%) requiring a personal finance course for California high schoolers going to voters in the November 2024 campaign, the incremental funding will enable NGPF to hire CA-specific implementation specialists to speed up adoption of this new course.

- Develop a game to teach students about the car-buying process. NGPF's Arcade is the most popular section of the NGPF website with more than 15 million game plays annually. Given that our car-buying mini-unit was one of our most popular product launches, we know there is interest in a game like this. It will be another way to reach even more students and engage them in a way to help them avoid the traps in the process: from a focus on monthly payment (vs. total payments) to GAP insurance and other add-ons.

I think it's also important to note that many facets of our flagship Semester Course incorporate lessons that build consumer skills that help in the car buying process. In addition to a series of focused lessons on the car buying process which will be expanded through this grant, there are additional helpful lessons sprinkled throughout our course. These include:

- The psychology behind car purchases (including Fear of Missing Out (FOMO) in our Behavioral Economics Unit





---

- The steps required to build a strong credit score and the impact it has on total car cost in our Types of Credit and Managing Credit Units
- Budgeting activities where students can see how transportation fits into an overall budget in our Budgeting Unit
- The details behind car insurance policies and the various types of coverage are in our Insurance Unit.

By spiraling these concepts throughout the curriculum, students will retain this information better.

In terms of reach, teachers using NGPF personal finance curriculum today reach about 3 million students annually. With the total market expected to double over the next 3 years, we anticipate that number reaching 6 million students and 200,000 teachers. This incremental funding will accelerate our plans so we can reach more students faster. Each year that we can accelerate our implementation plans means approximately 1 million students will receive access to these lessons sooner.

Finally, the impact of these courses go beyond the students in the classroom to their families too. Research has shown a ripple or spillover effect where students are taking what they have learned in the classroom home to their parents meaning the impact is amplified. In addition, teachers who teach a personal finance course, find themselves in better financial situations based on what they are learning also. We hear this consistently in the professional development work that we do.

**Next Gen Personal Finance**
330 Primrose Rd, Suite 202
Burlingame, CA 94010

ngpf.org
info@ngpf.org



**Next Gen Personal Finance Proposal Budget (Revised 4/24/24)**

| | 2024 | 2025 | 2026 | 2027 | 2028 | |
|---|---|---|---|---|---|---|
| **Expand access to Financial Education in large, diverse school district** | | | | | | |
| Grant program to support Fresno Unified School District to hire a personal finance specialist over a 3 year period. | **$130,000** | **$130,000** | **$130,000** | | | |
| Goal: All 16 schools in the district offer an elective course in personal finance | | | | | | |
| Impact: 73,000 students in the third largest school district in California; 90% minority student population and 65% economically disadvantaged | | | | | | |
| **Expand access to Financial Education in large, diverse school district** | | | | | | |
| Grant program to support Dallas Independent School District (TX) to hire a personal finance specialist over a 3 year period. | | **$130,000** | **$130,000** | **$130,000** | | |
| Goal: Expand access in the 38 high schools in the district | | | | | | |
| Impact: 143,000 students in the second largest school district in Texas; 91% minority student population and 63% economically disadvantaged | | | | | | |
| **Deliver in-person professional development workshops ("FinCamps") across United States** | | | | | | |
| Number of FinCamps | 15 | 15 | 20 | 22 | 24 | |
| Cost per event (from FinCamp Budget) | $11,500 | $11,500 | $11,500 | $11,500 | $11,500 | |
| **TOTAL FinCamp Cost** | **$172,500** | **$172,500** | **$230,000** | **$253,000** | **$276,000** | |
| **Complete FinCamps in five largest districts in Texas (Houston, Dallas, Cypress, Northside ISD, Austin)** | | | | | | |
| Number of FinCamps | | 5 | 5 | 5 | 5 | |
| Cost per event (from FinCamp Budget) | | $11,500 | $11,500 | $11,500 | $11,500 | |
| **TOTAL FinCamp Cost in Texas** | | **$57,500** | **$57,500** | **$57,500** | **$57,500** | |
| **Increase NGPF capacity to provide professional development** | | | | | | |
| Professional Development Specialists | 1 | 2 | 2 | 2 | 2 | |
| Cost per hire @$90k salary + 30% benefits = $117,000 | $117,000 | $117,000 | $117,000 | $117,000 | $117,000 | |
| **Total PD Cost** | **$117,000** | **$234,000** | **$234,000** | **$234,000** | **$234,000** | |
| **Increase NGPF capacity to support implementation of personal finance requirement in California professional development** | | | | | | |
| Implementation Specialists (CA-focus) | 0.5 | 2 | 2.5 | 3 | 3 | |
| Cost per hire @$90k salary + 30% benefits = $117,000 | $117,000 | $117,000 | $117,000 | $117,000 | $117,000 | |
| **TOTAL Implementation Cost (California)** | **$58,500** | **$234,000** | **$292,500** | **$351,000** | **$351,000** | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Increase NGPF capacity to implement new personal finance requirements by supporting state Education Depts. and large districts** | | | | | | |
| Implementation Specialists | | 2 | 3 | 4 | 4.5 | 5 |
| Cost per hire @$90k salary + 30% benefits = $117,000 | | $117,000 | $117,000 | $117,000 | $117,000 | $117,000 |
| **TOTAL Implementation Cost (National)** | | **$234,000** | **$351,000** | **$468,000** | **$526,500** | **$585,000** |
| | | | | | | |
| | | | | | | |
| **Create interactive game focused on car buying process to add to NGPF Arcade** | | **$205,000** | **$205,000** | | | |
| | | | | | | |
| | | | | | | |
| **Create curricula focused on vehicle purchasing and financing for both teachers and students** | | **$50,000** | **$35,000** | **$35,000** | **$35,000** | **$35,000** |
| Includes on-demand module for teachers, a comprehensive lesson for students, a FinCap Friday. All of this curricula will be updated annually to reflect changes in car buying | | | | | | |
| | | | | | | |
| **Create curriculum crosswalks to align curriculum with state standards** | | **$25,000** | **$12,500** | **$12,500** | **$12,500** | **$12,500** |
| As new states require a course in personal finance, critical to align NGPF curriculum to their standards ($2,500 per state) | | | | | | |
| | | | | | | |
| **TOTAL Cost** | **$7,293,500** | **$992,000** | **$1,561,500** | **$1,589,500** | **$1,599,500** | **$1,551,000** |



**Santa Ana Office**
1851 East Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344
**www.judicatewest.com**

## PROOF OF SERVICE

I, the undersigned, am an employee of Judicate West, located at 1851 East First Street Suite 1600, Santa Ana, CA 92705 declare under penalty of perjury that I am over the age of eighteen (18) and not a party to this matter or proceeding.

On May 15, 2024, I served the foregoing documents, described as:

### SPECIAL MASTER'S ORDER REGARDING CY PRESS

**SEE ATTACHED MAILING LIST**

(X) **BY E-MAIL** I caused the above-referenced document to be transmitted via electronic mail (e-mail) to the parties as listed on this Proof of Service

( ) **BY ELECTRONIC FILING** I caused such document to be sent via electronic service by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com.

( ) **BY FASCIMILE** I caused the above-referenced document to be transmitted via facsimile to the parties as listed on this Proof of Service. The document was transmitted by facsimile transmission and the transmission was reported as complete and without error.

( ) **BY PERSONAL SERVICE** I personally delivered the documents to the persons at the address (es): by leaving the documents at the person (s) office, in an envelope or package clearly labeled to identify the person(s) being served, with a receptionist or an individual in charge of the office.

( ) **BY UNITED STATES PARCEL SERVICE** I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa Ana, California in the ordinary course of business

(X) **STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

( ) **FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **May 15, 2024,** at Santa Ana, California

*Heidi Adams*
Heidi Adams
Judicate West

**JUDICATE WEST**
Alternative Dispute Resolution
*CELEBRATING 30*

**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

## Case Contact List

as of Wednesday, May 15, 2024

**JW Case #: A295051**

### Case Caption: *William Martin, et al. vs. Toyota Motor Credit Corporation, et al.*

Jason M. Frank, Esq.
Frank, Sims & Stolper, LLP
19800 Macarthur Blvd.
Suite 855
Irvine, CA 92612
Phone: (949) 201-2400   Fax: (949) 201-2405
Email: ssims@lawfss.com
Representing William Martin; Lori Mitchell, et al.

Scott H. Sims, Esq.
Frank, Sims & Stolper, LLP
19800 Macarthur Blvd.
Suite 855
Irvine, CA 92612
Phone: (949) 201-2400   Fax: (949) 201-2405
Email: ssims@lawfss.com
Representing William Martin; Lori Mitchell, et al.

Andrew D. Stolper, Esq.
Frank, Sims & Stolper, LLP
19800 Macarthur Blvd.
Suite 855
Irvine, CA 92612
Phone: (949) 201-2400   Fax: (949) 201-2405
Email: astolper@lawfss.com
Representing William Martin; Lori Mitchell, et al.

Franklin D. Azar, Esq.
Franklin D. Azar & Associates
14426 E. Evans Ave.
Aurora, CO 80014
Phone: (303) 757-3300   Fax: (303) 757-3206
Email: azarf@fdazar.com
Representing William Martin; Lori Mitchell, et al.

Brian J. Hanlin, Esq.
Franklin D. Azar & Associates
14426 E. Evans Ave.
Aurora, CO 80014
Phone: (303) 757-3300   Fax: (303) 757-3206
Email: hanlinb@fdazar.com
Representing William Martin; Lori Mitchell, et al.

**JUDICATE WEST**
**CELEBRATING 30**
Alternative Dispute Resolution

**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

Ashley L. Shively, Esq.
Holland & Knight, LLP
560 Mission Street
Suite 1900
San Francisco, CA 94105
Phone: (415) 743-6900   Fax: (415) 743-6910
Email: ashley.shively@hklaw.com
Representing Toyota Motor Credit Corporation; Toyota Motor Insurance Services, Inc.


Judith M. Mercier, Esq.
Holland & Knight, LLP
200 S. Orange Ave.
Suite 2600
Orlando, FL 32801
Phone: (407) 425-8500   Fax:
Email: judy.mercier@hklaw.com
Representing Toyota Motor Credit Corporation; Toyota Motor Insurance Services, Inc.